# United States Court of Appeals
## For the First Circuit

No. 13-1387

UNITED STATES OF AMERICA,

Appellee,

v.

ESTEVENSON ETIENNE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, U.S. District Judge]

Before

Lynch, Chief Judge,
Thompson, Circuit Judge,
and Smith,* District Judge.

Charles W. Rankin, with whom Kerry A. Haberlin was on brief,
for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with whom
Carmen M. Ortiz, United States Attorney, was on brief, for
appellee.

October 29, 2014

* Of the District of Rhode Island, sitting by designation.

**THOMPSON, Circuit Judge.** This appeal arises out of the government's attempt to prove the old adage, where there's smoke there's fire. Appellant Estevenson Etienne ("Etienne") appeals his conviction on a charge of conspiring to distribute cocaine base, otherwise known as "crack." Thanks to the jury's guilty verdict, Etienne found himself sentenced to seventy months (nearly six years) in jail.

Now, Etienne asks us to vacate his conviction because he says the district judge admitted improper overview testimony from a government agent, allowed government witnesses to identify voices on recordings without proper foundation, and erroneously permitted law enforcement officers to improperly interpret for the jury what was taking place on those recordings. In the alternative, Etienne seeks resentencing pursuant to Alleyne v. United States, 133 S. Ct. 2151 (2013).

We affirm.

## I. BACKGROUND

Because Etienne's appeal follows the jury's finding of guilt, we view the facts in the light most favorable to the verdict. United States v. Rodriguez, 731 F.3d 20, 23 (1st Cir. 2013), cert. denied, 134 S. Ct. 1329 (2014). We begin by summarizing the evidence at trial, reserving additional details for our discussion of Etienne's specific arguments.

## A. The ATF Investigation

2009 found the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") looking to smoke out drug dealers on Boston's North Shore. Our story begins with an individual identified only as "Paul." Paul found himself in hot water after the ATF discovered he had illegally procured a gun for an individual we'll call "Smith,"[1] a known criminal in the North Shore town of Lynn, Massachusetts. When confronted with the evidence against him, Paul agreed to work with the ATF in order to avoid prosecution. Ultimately, the ATF had Paul buy $40 of cocaine from Smith.

The ATF went up the chain, so to speak, and let Smith know they had him on drug distribution. Like Paul before him, Smith agreed to become an informant and cooperate in the ATF's investigation. Ultimately, Smith worked with the ATF for about a year and helped out with over a dozen investigations. Over the course of the year, the ATF paid him in excess of $4100 for his assistance, $400 of which was attributable to his work enabling this particular prosecution.

Making use of Smith's knowledge, ATF Special Agent John Mercer ("Mercer") identified several additional targets in the area. Among them were Andre Jean-Francois, known as "Black," and

---

[1] "Smith" is an alias. We have changed his name in light of concerns about the safety of cooperating witnesses raised by the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

Etienne, who went by the nickname "Smoke," and Smith described them as drug dealers from whom the ATF could buy crack.  Mercer had him set up controlled buys to catch them in the act.  Each transaction (there were two) began with Smith calling Jean-Francois to negotiate the deal, after which Jean-Francois arranged for Smith to make the physical purchase from Etienne.  Although the deals were recorded through the use of a body wire, the government did not introduce any video or photographic evidence depicting the deals as they went down.

The first deal took place on July 22, 2009.  On Mercer's instructions, Smith had called Jean-Francois the previous day looking to buy half an ounce of crack, and the two agreed on a price of $600.  On July 22, Smith met with Mercer and other law enforcement agents before getting back in touch with Jean-Francois. With the agents listening in and recording the conversation, Smith called Jean-Francois to hammer out the details, and they agreed to meet at a house where Smith's young son lived in Lynn.  Before leaving for the rendezvous, Smith donned a body wire and law enforcement officers gave him $600 to pay for the drugs.  Smith then went to his son's house to wait for Jean-Francois.

Shortly after Smith got to the house, Jean-Francois called him back to say that plans had changed.  Smith would now be buying the drugs from Etienne instead, and Smith was to go to Etienne's home, which was also in Lynn.  Jean-Francois told him the

price had gone up too, and was now $650. Mercer authorized Smith to use $50 from his own pocket to cover the difference.

After hearing from Jean-Francois, Smith called Etienne to confirm the new plan. Etienne confirmed they would make the exchange at his house on Hollingsworth Street, and Smith headed over. Massachusetts State Trooper James Bruce ("Bruce")--who was conducting surveillance and listening to Smith's body wire as a part of the ATF's investigation--observed Smith arrive at Etienne's house. Bruce observed Smith speak briefly with Etienne on the porch before both men headed inside.

Once inside, Smith and Etienne spoke for a few minutes about Smith's car and young son (who was sick with cancer), and Etienne's daughter, who Etienne had custody of because her mother was in jail. Etienne also asked Smith whether Smith was still selling marijuana, to which Smith replied that he only sold crack now. While inside, Smith gave Etienne the $650 and in return received a plastic bag containing what Smith believed to be half an ounce of crack.

After a few minutes, Bruce observed Smith emerge from Etienne's house, get in his vehicle, and drive up the street Mercer intercepted Smith at the end of the street and followed him back to a prearranged meeting location. When they arrived at the spot, Smith handed a plastic baggie over to law enforcement agents. The

parties stipulated that the plastic bag contained 15.25 grams of crack.

The second transaction happened on July 30, 2009. This time, Mercer instructed Smith to call Jean-Francois to ask about buying a whole ounce of crack. Smith did so, and Jean-Francois agreed to make the sale for $1300. Once again, Smith met with law enforcement agents before the buy. While in their presence, Smith placed three recorded calls to Jean-Francois to further discuss the terms of the deal, ultimately confirming he would buy one ounce of crack for $1300. As before, the plan was for Smith to physically get the drugs from Etienne, although this time Jean-Francois wanted Smith to first visit him at his auto-detailing shop in Salem, Massachusetts.

Law enforcement agents equipped Smith with a body wire and gave him $1300 to close the deal before sending him out. Smith went to see Jean-Francois at his shop, where they smoked weed together and talked about the impending crack deal. They also got into some of their past history and discussed a debt Smith still owed Jean-Francois. The debt dated back to a time (before Smith became an informant) when Jean-Francois "front[ed]" him some crack but, unfortunately for both, Smith "ended up getting locked up" and was unable to pay for it.

After leaving Jean-Francois's shop, Smith called Etienne to say he was on the way. At first, Etienne said he wasn't ready

for Smith because he hadn't gotten the drugs yet, but called Smith right back and told him to come on over. When Smith entered Etienne's house, Bruce was again listening to the body wire and watching from a distance.

Etienne asked Smith how much he had with him, and Smith responded "thirteen." Smith gave the $1300 to Etienne, and received back a "regular sandwich baggie" containing an ounce of crack. As before, Smith traveled to a prearranged meeting location (again under the watchful eyes of law enforcement) where he turned the plastic bag over to law enforcement agents. The parties stipulated that this bag contained 27.82 grams of crack.

## B. Criminal Proceedings

On March 23, 2011, a federal grand jury indicted Jean-Francois and Etienne, charging them with conspiracy to distribute crack in violation of 21 U.S.C. §§ 841(a)(1) and 846. The indictment alleged the conspiracy began at "a time unknown," but was in existence "at least by on or about July 22, 2009, and continuing thereafter until on or about July 30, 2009." It further alleged Etienne and Jean-Francois conspired to distribute at least five grams of crack, which at the time it issued would have triggered a mandatory minimum sentence of five years under 21 U.S.C. § 841(b)(1)(B).[2]

---

[2] The Fair Sentencing Act of 2010 increased the amount of crack necessary to trigger the mandatory five-year minimum sentence from five grams to twenty-eight grams. See Fair Sentencing Act of

Etienne's jury trial began on July 30, 2012, and lasted three days.[3] The government called three witnesses: Mercer, Smith, and Bruce. Etienne did not testify or put on an affirmative case. Instead, he focused on attacking Smith's character and credibility during cross examination, homing in on Smith's potential motives for cooperating with law enforcement. In particular, Etienne got Smith to admit that if he did not cooperate, he was looking at "mad time" for his own past crimes, which involved drug dealing, carrying a firearm without a license, and assault with a dangerous weapon. Smith also admitted that he received "$200 every time, no matter what" for each drug deal he engaged in at the ATF's behest.

In his closing, defense counsel impugned Smith's credibility, repeatedly sounding "if you can't believe the messenger, you can't believe the message" as his refrain. Counsel told the jury Smith is "a bad guy, with multiple convictions for drugs and guns, been to jail twice," and "[d]oesn't want to go back and he's looking at ten plus more years" if charged with the crimes the government overlooked in return for his testimony. Counsel described Smith as a man who "could dream up a case against his

2010, Pub. L. No. 111-220, § 2(a)(2). Etienne was sentenced after the effective date of the Fair Sentencing Act, and thus the twenty-eight gram requirement applies to his sentence. See Dorsey v. United States, 132 S. Ct. 2321, 2335 (2012). The parties and district court recognized this at sentencing.

[3] Jean-Francois pleaded guilty three days earlier. He was ultimately sentenced to sixty months (or five years) of imprisonment, followed by four years of supervised release.

grandmother for two hundred bucks and a get-out-of-jail-free card."
In sum, counsel tried to sell the jury on the idea that Smith had
lied on the stand and simply made up the drug deals with Etienne.

The jury did not buy what Etienne was peddling, and
returned a guilty verdict. At sentencing, the district judge
determined Etienne was responsible for distributing more than
twenty-eight grams of crack, and concluded Etienne was subject to
a mandatory minimum sentence of five years based on this drug
quantity. He went on to impose a seventy-month (five years and ten
months) sentence to be followed by four years of supervised
release, plus a $100 special assessment.

Etienne timely appealed.

## II. ANALYSIS

Etienne challenges both his conviction and his sentence.
First, he asks us to throw out his conviction because the district
judge improperly admitted certain overview, identification, and
interpretive testimony, all of which he says improperly bolstered
Smith's questionable credibility and consequently "eviscerated
[his] exclusive defense at trial -- that [Smith] was lying."
Etienne also argues Mercer improperly offered his personal opinion
about the strength of the government's case. Failing that, Etienne
asks us to vacate his sentence because the judge supposedly
committed an Alleyne error at sentencing by applying the minimum

-9-

five-year sentence in the absence of a jury finding as to drug quantity.

We address these claims in turn, beginning with the evidentiary challenges.

## A. Evidentiary Challenges

### 1. Standard of Review

Etienne did not object to any of the testimony he now claims was admitted in error. Accordingly, he admits that none of the arguments raised here have been preserved for appellate review.

We review unpreserved evidentiary challenges for plain error only. See United States v. Whitney, 524 F.3d 134, 139-40 (1st Cir. 2008). "[A] party who neglects to call a looming error to the trial court's attention acts at his peril; under plain error review, we have leeway to correct only the most egregious of unpreserved errors." United States v. Sánchez-Berríos, 424 F.3d 65, 73 (1st Cir. 2005). Thus, Etienne bears the heavy burden of demonstrating (1) that an error occurred, (2) which was plain or obvious, (3) affected his substantial rights, and (4) "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." Whitney, 524 F.3d at 139-40 (citations omitted) (internal quotation marks omitted). We reverse only sparingly in the plain error context, id., and we should be especially loath to do so where it appears from the record that a failure to object was the result of counsel's trial tactics, see

United States v. Griffin, 818 F.2d 97, 100 (1st Cir. 1987) ("Nor can we trifle with the tactical decisions of counsel" on plain error review.); see also United States v. Rivera, 872 F.2d 507, 509 (1st Cir. 1989) ("[W]e realize, too, that plain error with respect to a matter readily remediable, if not a trap for the court (advertent or inadvertent), gives a defendant a free second bite at the cherry, and is to be narrowly limited.").

Against this backdrop, we address each of Etienne's evidentiary challenges in turn.

**2. Overview Testimony**

Etienne focuses his evidentiary challenges primarily upon what he dubs Agent Mercer's "overview" testimony. An "overview witness" is a government agent who testifies as one of the prosecution's first witnesses and, as the term implies, provides an overview or roadmap of the prosecution's case to come. United States v. Brown, 669 F.3d 10, 24 (1st Cir. 2012). Overview testimony is inherently problematic for at least three reasons: "(1) the jury could be influenced by statements of facts and credibility determinations not in evidence; (2) later testimony could be different from what the overview witness assumed; and (3) the jury may place greater weight on evidence that they perceive has the imprimatur of the government." Id. at 24 (citing United States v. Flores-de-Jesús, 569 F.3d 8, 16-17 (1st Cir. 2009); United States v. Casas, 356 F.3d 104, 119-20 (1st Cir. 2004)).

-11-

Disfavored overview testimony in drug conspiracy cases is generally elicited when the government calls a law enforcement agent as its first witness to testify--based on the results of the agency's overall investigation, rather than on his own personal knowledge or participation--that the charged drug conspiracy actually existed. See United States v. Rosado-Pérez, 605 F.3d 48, 55 (1st Cir. 2010) ("Overview testimony at times involves a witness's assertion of facts not based on his own knowledge when those facts are not otherwise proven."). The overview witness commonly goes on to testify about a defendant's specific role in the charged conspiracy. In other words, far from providing an "overview" of the case, the witness actually testifies that the defendant is guilty of the crime charged.

For more than a decade now, we have repeatedly admonished prosecutors who insist on presenting this sort of testimony. Brown, 669 F.3d at 24; see, e.g., United States v. Meises, 645 F.3d 5, 14-16, 18 (1st Cir. 2011) (improper overview where government's witness testified, without personal knowledge, that certain defendants were members of the charged drug conspiracy and identified their specific roles within that conspiracy); Flores-de-Jesús, 569 F.3d at 14-15, 17-27 (government's first witness improperly circled photographs of the three defendants appearing on a chart depicting twenty-five members of the alleged drug conspiracy and told the jury that one defendant was a "seller" and

the other two were "both sellers and runners" in that conspiracy); Casas, 356 F.3d at 118-20 (government agent, going "well beyond his personal knowledge," improperly "testified that there was a drug trafficking organization, . . . that all four of the defendants were members of this organization, and that the organization handled specific massive quantities of cocaine and heroin").

Nevertheless, we have not imposed a blanket ban on all overview testimony.  Rather, we have recognized that "[t]here may be value in having a case agent describe the course of <u>his investigation</u> in order to set the stage for the testimony to come about the nature of the conspiracy and the defendants involved." <u>Flores-de-Jesús</u>, 569 F.3d at 19 (emphasis added).  A government agent's testimony, when based on his personal knowledge and limited to a description of his activities in the course of an investigation, may in some circumstances be helpful to provide background information and to explain how and why agents became involved with a particular defendant in the first place.  <u>Id.</u> (quoting <u>United States</u> v. <u>Goosby</u>, 523 F.3d 632, 638 (6th Cir. 2008)); <u>see</u> <u>also</u> <u>Rosado-Pérez</u>, 605 F.3d at 55-56 (finding that government witness's testimony, based on his personal knowledge, about how surveillance "videos and wiretap recording fit into the rest of the conspiracy . . . [was] not overview testimony and [was] properly admitted").

-13-

What is not acceptable is when "a government witness testifies about the results of a criminal investigation, usually including aspects of the investigation [that] the witness did not participate in"--and therefore lacks personal knowledge of--"before the government has presented evidence." Rosado-Pérez, 605 F.3d at 55. Indeed, such testimony is nothing more than an improper attempt to transmute the prosecutor's opening argument into substantive evidence. See Flores-De-Jesus, 569 F.3d at 17 ("The law already provides an adequate vehicle for the government to 'help' the jury gain an overview of anticipated evidence as well as a preview of its theory of each defendant's culpability: the opening statement.") (quoting United States v. Garcia, 413 F.3d 201, 214 (2d Cir. 2005) (internal quotation marks and alteration omitted)).

With these principles in mind, we turn to the testimony Etienne challenges as improper overview testimony. The government opened its case with Mercer. After briefly describing his twenty-two years of law enforcement experience and his assignment to investigate "gangs, guns and drugs" on the North Shore, Mercer explained how he came to investigate Jean-Francois and Etienne. Mercer testified that he first secured Smith's cooperation, and then Smith identified Jean-Francois and Etienne, among other individuals, as potential targets. Mercer explained that Smith knew who Etienne and Jean-Francois were because they were "past

-14-

criminal associates that he had done business with, drug business with in the past." He also said that Smith referred to Etienne and Jean-Francois by their respective nicknames, "Smoke" and "Black."

Mercer then proceeded to discuss the ATF's general investigatory techniques, which included mobile surveillance, recording phone calls, and using body wires to monitor and record in-person conversations. Mercer described the specific steps he took to set up and implement the July 22 and July 30 drug buys, which included instructing Smith to make telephone calls to Jean-Francois and Etienne. Along the way, he confirmed that he had listened to the various recorded telephone and body-wire conversations between Smith, Jean-Francois, and Etienne in real-time and had reviewed the recordings afterwards. He also summarized portions of the recordings as part of the government's introduction into evidence of the transcript of each recorded conversation.[4]

On appeal, Etienne argues that the government used Mercer's testimony to do exactly what we have prohibited. He specifically complains about Mercer's testimony that Smith knew Jean-Francois and Etienne as past criminal associates with whom he had done drug business before, along with Mercer's testimony that he wanted to use Smith to identify and go after people who were

---

[4] None of the actual recordings were played while Mercer was on the stand.

supplying Smith with drugs.  According to Etienne, his testimony was "tantamount to telling the jury that a conspiracy existed and that Etienne was part of it."  He further intimates that Mercer's testimony about the nature of Smith's relationship with himself and Jean-Francois was improper because it "necessarily derived from [Smith's] hearsay accusation."

In response, the government tells us Mercer did not offer an improper overview.  It says Mercer's testimony was proper because he based it on his personal knowledge of the investigation and did not opine on Etienne's role in the charged conspiracy.  The government also argues that Mercer's testimony about Smith's past dealings with Etienne and Jean-Francois did not violate the rule against hearsay:  per the government, Mercer's testimony had the nonhearsay purpose of providing background and explaining to the jury how the ATF came to investigate Etienne in the first place.

The record here leads us to side with the government. Mercer's testimony is not akin to the type of overview testimony in which a government agent kicks off the prosecution's case with a blanket assertion that a defendant was a member of the charged conspiracy, and which we sharply criticized in Meises, Flores-De-Jesus, and Casas.[5]  With respect to the conspiracy charged here,

_____

[5] Mercer's testimony that Smith was familiar with Etienne and Jean-Francois because they were "past" criminal associates gives us some pause.  This testimony regarding Etienne's prior bad acts was of questionable relevance.  It also ran the danger of prejudicing the jury and encouraging it to convict based on Etienne's uncharged

-16-

Mercer testified to the activities he undertook in setting up each July 2009 drug deal. Mercer described his contemporaneous monitoring of conversations involving Smith and Etienne or Smith and Jean-Francois, explained to the jury what the speakers were talking about in each conversation, and stated that Smith and Etienne ultimately exchanged money for drugs on July 22 and July 30. Having thoroughly reviewed the record, we are satisfied that at least most of Mercer's testimony about Etienne's involvement was based on his personal knowledge and "represented the fruits of first-hand police work." United States v. Valdivia, 680 F.3d 33, 48 (1st Cir. 2012). To the extent that there is any ambiguity about Mercer's knowledge of prior acts, we will not, on plain error review, permit Etienne to gain any benefit from his choice not to clarify the ambiguity. Accordingly, we conclude Mercer did not offer improper overview testimony. See Rosado-Pérez, 605 F.3d at 55-56.

As for the hearsay objection embedded in Etienne's argument, Etienne did not raise a hearsay objection at trial and the issue is waived here given that he failed to develop it on appeal. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir.

conduct. Although we have analyzed the "propriety of [a] trial judge's admission of prior bad acts evidence under the aegis of Rules 404(b) and 403 of the Federal Rules of Evidence," United States v. Doe, 741 F.3d 217, 229 (1st Cir. 2013), cert. denied, No. 13-10728, 2014 WL 2919345 (Oct. 6, 2014), Etienne did not argue at trial, nor does he assert on appeal, that the testimony should have been barred by either or both of these rules.

1990) ("[A] litigant has an obligation to spell out [his] arguments squarely and distinctly, or else forever hold [his] peace." (internal quotation marks omitted)).[6]

Summing up, we conclude that Mercer did not provide improper overview testimony.

### 3. Interpretive Testimony

Moving on, Etienne argues the trial judge erred in permitting Mercer and Bruce to offer specific instances of what he dubs "interpretive" testimony. He complains both were permitted to testify to their "interpretations" of the recorded conversations. By this he means that the law enforcement officers told the jury what they thought the conversations were about. They also interpreted the meaning of words they said had to do with drug sales, and testified that an exchange of drugs took place during certain conversations.

_____

[6] We also note that Etienne may have waived the objection to overview testimony entirely because the lack of evidentiary challenges throughout trial appears to be the result of his conscious litigation tactics. See United States v. Washington, 434 F.3d 7, 11 (1st Cir. 2006) (finding waiver where "counsel made a deliberate strategic choice" to admit certain evidence). Etienne's counsel filed a pre-trial motion in limine seeking to preclude overview testimony and was clearly sensitive to the pitfalls of improper overview testimony. During the hearing on his motion, defense counsel explicitly agreed with the trial judge's statements that "[s]ome general context is appropriate," and that Mercer's testimony is "something we have to police as we go along." Mercer's actual testimony, in defense counsel's eyes, apparently never crossed that line. This provides yet another basis for our refusal to fault the trial judge.

Etienne argues this testimony, which we will discuss in more detail momentarily, went hand-in-hand with Mercer's improperly admitted overview testimony and was especially prejudicial because Smith offered his own interpretation (which parroted Mercer's) as to what transpired during those conversations. In Etienne's view, this can only mean the law enforcement officers' testimony unfairly "bolstered" Smith's testimony and served to shore up his "shaky credibility." Taking a contrary viewpoint, the government says the testimony constituted permissible lay opinion based upon the officers' personal knowledge of the drug trade, and particularly, its parlance.

"[W]e have long held that government witnesses with experience in drug investigations may explain the drug trade and translate coded language for juries, either through lay or, if qualified, expert testimony." Rosado-Pérez, 605 F.3d at 56. Interpretive testimony, we have made clear, "is not overview testimony and is properly admitted." Id.

Although Etienne raises the issue of interpretive testimony, he cites little authority in support of his belief that the specific testimony at issue here was improper. He has not come forward with a single case in which we have reversed a conviction on plain error review due to erroneously admitted interpretive testimony. To his credit, Etienne forthrightly acknowledges that in the case he highlights most we actually upheld the admission of

the challenged interpretive testimony. See United States v. Albertelli, 687 F.3d 439, 446-50 (1st Cir. 2012).

We have reviewed the specific testimony challenged as interpretive, and only a few portions can be fairly described as such. First is Mercer's testimony regarding the July 30 deal and several related conversations, all of which he monitored in realtime. Mercer told the jury Smith and Jean-Francois had a telephone conversation in which Jean-Francois used the word "cake" to mean "money." When Smith met with Etienne later, the two men used the number "13" to mean the price of the drugs, $1300. Mercer also testified that while Smith and Etienne were discussing the price, "[y]ou could hear [over the recording] what appeared to be the sound of money being handed over, counted out, cash."

We are satisfied the district court did not plainly err in admitting this testimony based upon Mercer's twenty-two years of experience as an ATF agent and his contemporaneous monitoring of the conversations as they occurred.

Next is Bruce's testimony in which he told the jury that he monitored Smith's body wire on July 30 and "heard what sounded like a deal being consummated after initial greetings" between Smith and Etienne. At the time of trial, Bruce had been a state trooper for almost twenty years, with more than a decade of experience as a drug detective. He had been actively involved in the ATF's investigation of Etienne and Jean-Francois, and he

-20-

monitored these particular conversations in realtime. The nature of Bruce's testimony differed little from Mercer's. Accordingly, we cannot say the allowance of his interpretive testimony was error, plain or otherwise.

### 4. Mercer's Opinion of Guilt

Etienne next claims Mercer improperly "expressed his view that the government had proved beyond a reasonable doubt that there existed a conspiracy and Etienne was part of it" before opining that "the jury could convict" Etienne. Etienne points to Mercer's testimony on re-cross examination about Smith's obligation to testify truthfully in accordance with his cooperation agreement. This testimony came only after defense counsel asked several questions geared at pinning down exactly who would determine whether Smith had lied on the stand. Etienne never moved to strike it as non-responsive, nor did he ask the district judge to instruct the jury that they alone determine whether a witness's testimony is credible. We'll set forth the exchange to put it in context.

> Q. [By defense counsel] Who determines whether
> or not [Smith's] testimony is truthful?
>
> A. [Mercer] I guess the jury.
>
> Q. How about the government?
>
> A. I think ultimately the jury. Again, if we
> -- if I thought that he lied and I could prove
> it, I would bring it to the attention of the
> U.S. Attorney personally and I guess they'll
> make their own evaluation at some point.

Q.   So, then if Mr. Etienne doesn't get convicted, then you assume that the jury thinks [Smith] is lying and if he doesn't get a conviction in this case, [Smith] gets charged with everything going back to 2003, 2004, when he bought the guns in Woburn with Paul, right?

A.   No.

Q.   Isn't that what you just testified to?

A.   If your defendant -- if your client [Etienne] is found not guilty, that's the jury's decision.   That doesn't mean that [Smith] lied.  It may be we didn't have enough evidence, which I don't -- I think we have --

Q.   So that it won't be the jury that determines whether or not [Smith] is lying or telling the truth, it's going to be the government, the one that he made the deal with, who determines whether or not he's testified truthfully?

A.   That will be one of the factors, yes.

Etienne's argument that this testimony mandates a new trial is utterly without merit.  Defense counsel elicited the complained-of testimony, and even then only after an extended back-and-forth with Mercer.  Counsel not only opened the door to this response through his line of inquiry, but practically begged Mercer to walk through it by continuing to pursue it.  We will not now suffer to hear Etienne complain of a purported error for which he alone was responsible.[7]

_____

[7] In a single paragraph of his brief, Etienne cherry-picks several unobjected-to statements from the prosecutor's opening and closing arguments, then advances the notion that the government presented its case in such a way as to improperly vouch for Smith's

## 5.  Identification Testimony

Finally, we address Etienne's arguments regarding Mercer's and Bruce's testimony identifying the speakers heard in various recorded conversations.  Generally speaking, in the complained-of testimony the officers identified either Etienne's or Jean-Francois's voice on those recordings.  Etienne asserts (1) that this testimony was inadmissible because the government failed to lay a foundation for either law enforcement officer's ability to identify any of the voices in the recordings, and (2) the officers' opinions were not helpful to the jury (and should not have been admitted) because Smith made the same identifications when he took the stand.

In rejoinder, the government argues that the lack of a proper foundation for Mercer's identification testimony cannot be presumed in the absence of an objection, which would have led to an on-the-record proffer of a foundation.  As for Bruce, the government argues that his unobjected-to testimony established a foundation based on his opportunity to observe and hear both Smith and Etienne during the investigation.  Finally, the government says that even if any of the testimony was admitted in error, Etienne is

---

testimony.  Although he expounds on this theory at greater length in his reply brief, Etienne has provided us with no authority for his contention that the disparate statements were improper or that they form any basis for reversal on plain error review. Accordingly, we find any potential argument along these lines to be waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

unable to satisfy the third or fourth prongs of plain error review because Smith himself was competent to identify the individuals in the recordings, he did so on the stand, and Smith's testimony was consistent with that of Mercer and Bruce.

Because the government did not seek to qualify either Mercer or Bruce as an expert, we analyze their identification testimony as lay opinion under Federal Rule of Evidence 701. To be admissible, lay opinion must "be 'helpful to clearly understanding the witness' testimony or to determining a fact in issue,'" United States v. Díaz-Arias, 717 F.3d 1, 11-12 (1st Cir. 2013) (quoting Fed. R. Evid. 701(b)), and "'rationally based on the witness's perception,'" id. at 13. (quoting Fed. R. Evid. 701(a)). We have determined that a lay opinion is not "'helpful' to the jury 'when the jury can readily draw the necessary inferences and conclusions without the aid of the opinion.'" Id. at 12 (quoting United States v. Sanabria, 645 F.3d 505, 515 (1st Cir. 2011)).

Moreover, and despite Etienne's failure to raise the issue at trial, the government bore the "burden [of laying] a foundation that established the basis of [Mercer's and Bruce's] knowledge or opinion in connection with all of [their] testimony." United States v. Vázquez-Rivera, 665 F.3d 351, 361 (1st Cir. 2011); see also Rosado-Pérez, 605 F.3d at 55 ("A foundation should be laid establishing the basis of a witness's knowledge, opinion, or expertise.").

With these principles in mind, we may quickly dispose of the challenge to Bruce's testimony. The identifications Bruce made were of voices on the body wire recordings from July 22 and 30. Bruce testified that he established surveillance of Etienne's home on July 22 in a spot thirty to forty-five feet away where he had an unobstructed view. Bruce testified he had met Smith before that day, and that Smith's body wire--which allowed Bruce to hear his conversations "in realtime"--was "work[ing] very well." Further, Bruce personally observed Etienne standing on his porch when Smith arrived at his Hollingsworth Street home. Bruce watched as Smith approached and exchanged greetings with Etienne, after which they both went inside, whereupon he could no longer see them but could still "hear what was being said," thanks to Smith's body wire.

Contrary to Etienne's protestations, Bruce's testimony adequately established that he was capable of identifying Etienne's voice on the recordings by virtue of his previous familiarity with Smith coupled with his ability to observe and hear Smith's interaction with Etienne on the front porch. Bruce's opinion was clearly helpful to the jury. Not only did it assist the jury-- which was not familiar with the voices of Smith, Jean-Francois, or Etienne--in determining for itself who said what in the recordings,

it also tended to show Smith spoke with Etienne and not some other person inside the house.[8]  There was no error, plain or otherwise.

As for Mercer, he identified the recorded voices of both Etienne and Jean-Francois in telephone conversations and on the body wire.  The government, as Etienne contends, did not lay a foundation for this testimony, and on appeal it does not argue it did.  Instead, the government offers speculation as to potential foundational testimony that Mercer may have offered had he been asked.  Speculation is not foundation evidence, and we find the government's failure to elicit Mercer's identification testimony without attempting to lay a foundation was a plain and obvious error.

That being said, the third and fourth prongs of our plain error review nonetheless block Etienne's path to relief.  Recall that in addition to demonstrating plain error, Etienne must also prove the error affected his substantial rights and "seriously affect[ed] the fairness, integrity, or public reputation of [the] judicial proceedings."  Whitney, 524 F.3d at 140 (internal quotation marks omitted).  On this record, he is able to do neither.

---

[8] We, therefore, reject Etienne's argument that because the recordings spoke for themselves, and because Smith provided his own interpretation of what was going on, the district judge should have excluded Mercer's and Bruce's interpretive testimony as not helpful to the jury.

Although the government failed to lay a foundation for Mercer's identification testimony, it did do so for Smith's and Bruce's testimony. Smith, who had actually participated in the conversations, made his voice identifications while the actual tapes were playing, while Mercer and Bruce simply testified to their recollections as to who said what in each conversation. All three offered consistent testimony, and each was subject to rigorous cross-examination. Given that Etienne had the opportunity to expose any weaknesses in the testimony, we can not say the government's failure to lay a foundation for Mercer's identification testimony affected Etienne's substantial rights.

The strength of the evidence against Etienne only reinforces this conclusion. The indictment charged Etienne as a member of a drug distribution conspiracy in violation of 21 U.S.C. § 846. To convict, the government had to prove that Etienne "entered into an agreement with another to commit a crime," here, an agreement with Jean-Francois to distribute crack. United States v. Innamorati, 996 F.2d 456, 470-71 (1st Cir. 1993).

The recordings established that Jean-Francois orchestrated each drug deal and instructed Smith to make the physical exchange with Etienne. Etienne's presence at the time and place where Jean-Francois told Smith to pick up the drugs, combined with his preexisting awareness of the price (including the last-minute $50 increase on July 22), is powerful circumstantial

-27-

evidence against him.  See, e.g., United States v. Andújar-Basco, 488 F.3d 549, 558 (1st Cir. 2007) (The defendant's "very arrival at the appointed time and place designated for the transfer of [certain amounts of cash] is strong circumstantial evidence of his involvement in the conspiracy.").  The recordings themselves, as heard by the jury, established that the speakers used drug lingo, and they could be heard consummating a drug deal as well.

Additional evidence came from the parties' stipulations as to drug quantity.  While we will have occasion to discuss them in more detail later, the parties stipulated--and the jury was told during the government's case-in-chief--that Smith turned baggies over to law enforcement containing 15.25 grams and 27.82 grams of crack on July 22 and July 30, respectively.  As one ounce is approximately 28.35 grams, Smith obtained approximately half-an-ounce of crack on July 22, and just shy of one ounce on July 30. This comported with the recorded conversations in which Smith told Jean-Francois how much he was looking for on each occasion, and constituted further evidence of Etienne's involvement in the conspiracy.

All told, the evidence of guilt was overwhelming. We are satisfied therefore, that the erroneous admission of Mercer's identification testimony did not affect Etienne's substantial rights or seriously impair the fairness, integrity, or public reputation of his trial.

## B. <u>Alleyne</u>

Because Etienne is unable to show he is entitled to a new trial, we move on to address his argument that we must vacate his seventy-month sentence.  Etienne tells us the district court erred by imposing a statutory minimum mandatory sentence in violation of his Sixth Amendment rights as articulated by the Supreme Court in <u>Alleyne</u> v. <u>United States</u>, 133 S. Ct. 2151 (2013).  Etienne did not object to the imposition of a minimum sentence at sentencing, and as with his evidentiary challenges, he concedes that plain error review applies here.  Before getting into his argument, we provide a brief primer on <u>Alleyne</u>.

"In <u>Alleyne</u>, the Supreme Court extended the rule [announced in <u>Apprendi</u> v. <u>New Jersey</u>, 530 U.S. 466, 490 (2000),] requiring a jury to find, beyond a reasonable doubt, any fact that increases a maximum statutory penalty to any fact that requires imposing a statutory minimum penalty."  <u>United States</u> v. <u>Doe</u>, 741 F.3d 217, 233 (1st Cir. 2013), <u>cert. denied</u>, No. 13-10728, 2014 WL 2919345 (Oct. 6, 2014) (citing <u>Alleyne</u>, 133 S. Ct. at 2160).  <u>Alleyne</u> recognized that "a fact triggering a mandatory minimum [sentence] alters the prescribed range of sentences to which a criminal defendant is exposed."  <u>Alleyne</u>, 133 S. Ct. at 2160.  Therefore, "a fact increasing either end of the [sentencing] range produces a new penalty and constitutes an ingredient of the offense."  <u>Id.</u>  In today's post-<u>Alleyne</u> world, any such fact "must

be submitted to and found beyond a reasonable doubt by a jury, not by a judge utilizing a preponderance of the evidence standard at a sentencing hearing." Doe, 741 F.3d at 233.

Here, the five-year minimum sentence was triggered by the amount of drugs involved in the conspiracy. At the time the indictment issued, the conspiracy only needed to have involved 5 grams of crack for the five-year minimum to apply. The parties agree though that an intervening statutory amendment upped the ante and required the government to convince the jury that it involved at least 28 grams to require a minimum five-year sentence. Although the original indictment alleged the conspiracy involved more than 5 grams of crack, the government declined to seek a superseding indictment reflective of the new 28-gram threshold.

At sentencing, the district judge stated, "[w]ell, the jury didn't find it, but as a sentencing matter there's little question that the quantities involved, as stated in the [Presentence Report], exceed 28 grams." The prosecutor replied that this was "[c]orrect," while the defendant made no response. The government and defendant proceeded with their sentencing arguments (the defendant's focused on what he considered to be his minor involvement with the drug deals), with no discussion as to the drug quantities involved in the two transactions. The judge noted that the United States Sentencing Guidelines recommended a sentence between sixty-three and seventy-eight months, and he

-30-

opined that "the Guidelines themselves do a good job of considering and recognizing the factors that the [sentencing] statute sets out." The judge then imposed a seventy-month sentence. While the sentence ultimately imposed exceeded the five-year minimum, there is no doubt the district judge considered the minimum sentence to have been triggered by the involved drug quantities.

According to Etienne, the district judge erred in doing so because the jury did not make any determination as to the amount of drugs involved in either transaction. Further, he states, there was no evidence as to drug composition or weight at trial. And because the judge, as opposed to the jury, improperly made the finding it matters not that the district judge imposed a within-Guidelines sentence that exceeded the statutory minimum. Thus, Etienne urges us to remand for resentencing without regard to the statutory minimum (and, presumably, without taking any drug quantity into consideration).

The government, somewhat surprisingly, concedes the district court committed a clear or obvious error by imposing a mandatory minimum sentence. It focuses its argument instead on the third and fourth prongs of plain error review, contending that Etienne is unable to show the error affected his substantial rights or seriously impaired the fairness, integrity, or public reputation of the judicial proceedings. The government argues none of Etienne's substantial rights were affected thanks to the

uncontroverted evidence at trial that the two transactions involved more than enough crack to trigger the five-year minimum.  Further, the government says that no plain error can be shown because the sentence imposed--seventy months--was based upon the Guidelines range and the 18 U.S.C. § 3553(a) factors, not on the court's determination of drug quantity.

Although the parties agree an <u>Alleyne</u> error occurred, their stipulation on this question of law is of no import.  <u>See</u> <u>United States</u> v. <u>Teeter</u>, 257 F.3d 14, 28 (1st Cir. 2001) ("Stipulations about legal issues . . . normally are not binding on a court.").  Accordingly, we take a de novo look at the <u>Alleyne</u> issue.

What happened here is the parties stipulated to several facts prior to trial, including drug weight and composition.  The government introduced those stipulations in its case-in-chief during Mercer's testimony, each time without objection.  Before mentioning the first stipulated fact, the prosecutor addressed the court, stating "at this time we would ask, and we have agreed with [the] defense, to introduce portions of the stipulation of undisputed facts."  The trial judge made the following response:

> Okay.  Let me just say to the jury, sometimes facts are at issue in the case, sometimes they're not. The parties may sometimes agree that some things are factual.  So, they enter into what we call a stipulation, which is evidence of the facts that they would recite. That means there is no controversy between the parties about these matters.

The prosecutor proceeded to inform the jury that the parties agreed that in July of 2009 Etienne (1) lived in Lynn, Massachusetts, and (2) was the primary caretaker and had sole physical custody of a young daughter. He then continued his line of questioning regarding the first drug deal on July 22.

As Mercer concluded his testimony about that deal, the prosecutor entered the following stipulation into evidence without objection: "The white substance which was contained in a plastic baggie provided by [Smith] to federal agents on July 22, 2009 was cocaine base, also known as crack, and the net weight of the cocaine base itself was 15.25 grams." Later on, while Mercer was still on the stand, the prosecutor similarly read the following stipulated facts about the second drug buy: "The white substance which was contained in a plastic baggie provided by [Smith] to federal agents on July 30th, 2009, was cocaine base, also known as crack, and the net weight of the cocaine base itself was 27.82 grams."

Following both sides' closing arguments, the trial judge gave the following jury instruction regarding the parties' stipulations:

> Now, you have some different categories of evidence. You have some stipulations, what we call, and they were read at various places and you'll have, I believe, a copy of the document which records the stipulations. The stipulations are agreements between the government and the defendant that <u>you may take the facts stipulated to as being established</u>.

> *Those are not in contest*.   App. at 316
> (emphasis added).

Etienne did not object to this instruction, but even if he had, the instruction was correct.  It is well-established that a stipulation is a form of evidence that "should be presented to the jury, in whatever manner the parties and the courts agree to, prior to the close of evidence."  United States v. Pratt, 568 F.3d 11, 18 n.6 (1st Cir. 2009).

Thus, the prosecution introduced evidence during its case-in-chief showing that the two transactions together yielded a total of 43.07 grams of crack.  Not only was the evidence uncontested, Etienne expressly agreed to it.  This clearly established the minimum drug quantity attributable and/or foreseeable to Etienne during his involvement in the conspiracy. This number easily exceeded the 28 grams required to trigger a minimum five-year sentence.

The drug quantity cases upon which Etienne relies all involve situations in which the drug quantity evidence did not come in at trial.  Those cases necessarily involved an Apprendi or Alleyne violation, as the ultimate drug quantity findings were made by the judge at sentencing. See United States v. Zavala-Marti, 715 F.3d 44, 52-54 (1st Cir. 2013) (Apprendi violation where judge's drug quantity finding at sentencing exceeded amount set forth in the indictment and triggered a harsher maximum jail term); United States v. Harakaly, 734 F.3d 88, 96-97 (1st Cir. 2013) (Alleyne

-34-

error where drug quantity triggering mandatory minimum was neither alleged in indictment nor stipulated at time guilty plea entered); United States v. Delgado-Marrero, 744 F.3d 167, 183-84, 188-89 (1st Cir. 2014) (Alleyne error where judge imposed enhanced minimum after jury answered postverdict "special" question as to drug quantity, but had not been instructed its finding must be beyond a reasonable doubt); see also United States v. Barnes, --- F.3d ---, No. 11-1093, 2014 WL 5072846, at *2 (1st Cir. Oct. 10, 2014) (Alleyne error where judge found drug quantity triggering mandatory minimum by the preponderance of the evidence). Here, by contrast, Etienne himself affirmatively relieved the government of the burden of proof with respect to drug quantity.

"Factfinding premised on a defendant's admission is not a practice invalidated by Apprendi," Alleyne's pre-cursor. United States v. Eirby, 515 F.3d 31, 36 (1st Cir. 2008). By that same token, neither is it prohibited by Alleyne, which merely extends Apprendi's rule to facts that trigger mandatory minimum sentences. Given Etienne's admission that the two transactions involved more than 28 grams of crack, the district judge's imposition of a minimum sentence simply did not involve the type of "judicial factfinding" the Supreme Court found concerning in Alleyne. We

conclude, therefore, that Etienne's sentence is not violative of Alleyne.[9]

In a last-gasp effort to undo his stipulations, Etienne cites United States v. Torres-Rosario, 658 F.3d 110, 116 (1st Cir. 2011), to tell us that "courts may excuse waivers and disregard stipulations where justice so requires." He then asks us to disregard his stipulations with respect to drug quantity. Etienne, though, does not specify how or why justice requires that he be relieved of the stipulations. Moreover, he conveniently ignores our observation in the very case he cites that, "where a party makes an explicit and specific concession, practical reasons favor holding a party to such a concession, whether given in exchange for a quid pro quo or merely to avoid evidence that the party would prefer not to be presented." Id.

Etienne clearly stood to benefit from these stipulations. First, they reduced the number of witnesses against him by relieving the government of its burden to call witnesses to establish the weight and chemical makeup of the substances Smith

---

[9] True, the district judge at sentencing observed that although "the jury didn't find it, but as a sentencing matter there's little question that the quantities involved, as reported in the [Presentence Report], exceed 28 grams." The reason "the jury didn't find it," of course, is because Etienne had agreed to the drug quantities, thereby leaving nothing for the jury to do on that issue. Regardless, we may affirm the district court on any basis appearing in the record, such as Etienne's stipulations. United States v. Rodríguez-Peña, 470 F.3d 431, 433 (1st Cir. 2006) (per curiam). We do so here.

turned over to law enforcement.[10]  Such testimony would have distracted from the defense strategy of focusing solely on Smith and his motivation for, as Etienne saw it, feeding him to the ATF in order to save his own skin.  Indeed, testimony from one or more experts that the substances Smith turned over to law enforcement were what he had purported them to be could only serve to enhance Smith's credibility.

We also note the government indicated in its trial memorandum that, should the jury convict, it would seek to prove at sentencing "that the defendants [i.e., Jean-Francois and Etienne] conspired to distribute at least 280 grams of [crack], thus triggering a 10-year mandatory minimum sentence under [21 U.S.C.] § 841."[11]  This put Etienne on notice that the government likely had evidence beyond the two sales in July 2009.  Had Etienne challenged drug composition or quantity, the government may have introduced

_____

[10] The government had stated in its trial memorandum (filed before the parties stipulated to drug quantity) that it intended to call an expert witness to testify that the substances Etienne sold to Smith in July 2009 together contained more than 28 grams of crack.

[11] A drug conspiracy involving 280 grams of crack actually exposed Etienne to a potential life sentence.  See 21 U.S.C. § 841(b)(1)(A)(iii) (providing ten-year to life sentence as punishment for any person who knowingly or intentionally distributes or possesses with intent to distribute at least 280 grams of crack); 21 U.S.C. § 846 (rendering any person who "conspires to commit any offense defined in this subchapter . . . subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy").

evidence of additional drug sales.  This obviously would have been harmful to Etienne's interests, and stipulating to the lower drug quantity forestalled this possibility.

As it turns out, and although <u>Alleyne</u> had not yet been decided when Etienne was sentenced, the government did not attempt to prove at sentencing that the conspiracy involved at least 280 grams of crack.  <u>See</u> <u>United States</u> v. <u>Mills</u>, 710 F.3d 5, 15 (1st Cir. 2013) (recognizing in a pre-<u>Alleyne</u> opinion that drug quantities may be found at sentencing by a preponderance of the evidence).  At the time of trial, Etienne would have understood the government only needed to introduce enough evidence to obtain a conviction on the conspiracy charge, but could then introduce evidence of drug quantity at sentencing in an attempt to trigger the ten-year minimum.  Although the record does not explicitly reveal why Etienne decided to stipulate to drug composition and quantity at trial, it is noteworthy that, after he did so, the government chose not to seek the possible ten-year minimum at sentencing.

Etienne obviously felt the benefits of stipulating to drug quantity warranted giving up the opportunity to challenge drug weight and composition.  That he has come to regret his stipulation is not grounds for relieving him of its effect.  Doing so would allow Etienne to reap its benefits at trial, only to turn around and seek to reverse his conviction because the trial proceeded in

the exact manner he wanted.  Etienne's position boils down to an absurd desire to have his cake (the sugar-based kind, that is) and eat it too.  We, therefore, decline to permit Etienne to take back his drug quantity stipulations.

### III. CONCLUSION

Etienne's conviction and sentence are <u>affirmed</u>.