# United States Court of Appeals
## For the First Circuit

No. 08-1900

UNITED STATES OF AMERICA,

Appellee,

v.

LUIS ROSADO-PÉREZ,

Defendant, Appellant.

Nos. 08-2164, 08-2166

UNITED STATES OF AMERICA,

Appellee,

v.

MARCOS RIVERA-PEREZ,

Defendant, Appellant.

No. 08-2181

UNITED STATES OF AMERICA,

Appellee,

v.

EMANUEL RIVERA MALDONADO,

Defendant, Appellant.

No. 08-2183

UNITED STATES OF AMERICA,

Appellee,

v.

JUAN CARLOS TORRES-RODRIGUEZ,

Defendant, Appellant.

————————————————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José A. Fusté, U.S. District Judge]

————————————————

Before

Lynch, Chief Judge,
Selya and Lipez, Circuit Judges.

————————————————

Juan F. Matos de Juan for appellant Luis Rosado-Pérez.

Enrique Vélez-Rodríquez for appellant Marcos Rivera-Perez.

Anita Hill Adames for appellant Emanuel Rivera Maldonado.

Ramon Garcia-Garcia for appellant Juan Carlos Torres-Rodriguez.

Timothy R. Henwood, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Velez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, and Luke Cass, Assistant United States Attorney, were on brief for appellee.

————————————————

May 14, 2010

————————————————

**LYNCH**, **Chief Judge**. The four appealing defendants were convicted for their roles in a conspiracy to distribute cocaine, crack cocaine, and marijuana in Barriada San Miguel, known as El Cerro, in Naranjito, Puerto Rico, from 2005 to 2007. Three were convicted after a jury trial, Marcos Rivera-Perez, Juan Carlos Torres-Rodriguez, and Emanuel Rivera Maldonado; and one by a guilty plea, Luis Rosado-Pérez. Rivera Maldonado was a corrupt municipal police officer who aided the conspiracy.

Rivera-Perez, Torres-Rodriguez, and Rivera Maldonado each challenge the sufficiency of the evidence for their convictions. Rivera-Perez and Torres-Rodriguez also argue that the government improperly presented an overview witness. We affirm. The evidence sufficed, and a government agent witness did not give improper overview testimony. He appropriately testified from personal knowledge and explained drug activity and coded language to the jury, based on his experience.

Rosado-Pérez argues, for the first time on appeal, that he did not understand the terms of his plea and that the district court did not ascertain that a sufficient factual basis supported his plea. On plain error review, we affirm, finding no error at all.

## I. FACTUAL BACKGROUND

The structure of the conspiracy and the appellants' roles in it are described below as a rational jury could have found; further facts relevant to the claims on appeal follow.

Between 2005 and 2007 Manuel Chevres-Motta, not a party to these appeals, led an organization that distributed cocaine, crack cocaine, heroin, and marijuana in the El Cerro ward of Naranjito. Each of the appellants worked for Chevres-Motta, in various roles.

Chevres-Motta's drug organization sold only to known or vouched-for clients, usually from El Cerro. El Cerro's geography, which sets it apart from the rest of Naranjito, also limited the scope of this organization's drug trade. El Cerro rests atop a hill, and only one road, which cuts through El Cerro, connects it to Naranjito.

El Cerro "runners" supplied street dealers with drugs and ensured the dealers gave correct money to Chevres-Motta. "Sellers" then sold those drugs at regular drug points in El Cerro, including a basketball court and a nearby stairwell. Sellers sold small packets of drugs out of black fanny packs, a characteristic of the El Cerro organization. "Escorts," usually local drug users, brought clients to drug points and vouched for them.

Luis Rosado-Pérez supervised the cocaine trade for Chevres-Motta. Marcos Rivera-Perez was a seller. Juan Carlos

Torres-Rodriguez "cooked" cocaine hydrochloride into crack cocaine. And Rivera Maldonado, a Naranjito municipal police officer, provided information to the group.

The conspiracy first came to the attention of law enforcement during a separate drug and money laundering investigation. A confidential informant in that case set up a meeting to sell drugs; Rolando Motta-Morales, a member of the conspiracy in this case, came to that drug meeting. For two months in 2006, federal officials wiretapped Motta-Morales's phone and learned that Motta-Morales cooked crack cocaine for his cousin, Chevres-Motta. They also learned that Torres-Rodriguez was Motta-Morales's neighbor and cooked crack with Motta-Morales, and that Rivera Maldonado was Motta-Morales's cousin and brother-in-law, as well as a corrupt officer.

Federal officers investigated the El Cerro drug organization for almost two years. Investigators conducted personal and video surveillance, wiretapped phones, completed about thirteen controlled drug buys through an undercover police officer buyer, and used a confidential informant from El Cerro.

On September 26, 2007, a federal grand jury handed up a twenty-eight-count indictment against thirty individuals, including the four on appeal in this case, for their participation in the conspiracy. The defendants in this case were charged in count one with conspiracy to possess with intent to distribute controlled

-4-

substances, 21 U.S.C. § 846, and in count twenty-eight with criminal forfeiture, id. §§ 853, 881.[1]

On May 2, 2008, a jury convicted Rivera-Perez, the seller, Torres-Rodriguez, the crack cooker, and Rivera Maldonado, the corrupt officer, on the conspiracy count, count one. The jury also imposed criminal forfeiture on Rivera-Perez and Torres-Rodriguez. On August 11, 2008, the district court sentenced Rivera-Perez and Torres-Rodriguez to 120 months in prison and Rivera Maldonado to 48 months in prison. It also sentenced all three defendants to five years' supervised release and a $100 special assessment.

Earlier, on March 14, 2008, Luis Rosado-Pérez, the supervisor of the cocaine trade, had pled guilty to the conspiracy and forfeiture counts, specifically to conspiring to distribute between 1.5 and 4.5 kilograms of crack cocaine. That quantity, combined with Rosado-Pérez's criminal history category, gave him a base offense level of 33 after a three-level downward departure for acceptance of responsibility. Rosado-Pérez's sentencing guidelines range was 135 to 168 months. The government, per the plea agreement, recommended a sentence of 135 months in prison, which the court accepted and imposed.

---

[1] Marcos Rivera-Perez was also charged in count twenty-seven with dealing in firearms without a license, 18 U.S.C. § 922(a)(1)(A). That charge was not submitted to the jury and was dismissed at sentencing.

II.  CLAIMS OF MARCOS RIVERA-PEREZ, JUAN CARLOS TORRES-RODRIGUEZ,
AND EMANUEL RIVERA MALDONADO AS TO THEIR CONVICTIONS

Three defendants argue that the evidence of intent and agreement to participate in the conspiracy was insufficient for a conviction.  Rivera-Perez and Torres-Rodriguez also argue that the court erred in admitting the testimony of Federal Bureau of Investigation Special Agent Regino Chavez, alleging Chavez gave improper "overview" testimony.  We reject both claims.

A.        Sufficiency of the Evidence

We review the sufficiency of the evidence for a conviction de novo.  United States v. Azubike, 564 F.3d 59, 64 (1st Cir. 2009).  We take the evidence and draw all reasonable inferences in the light most favorable to the prosecution.  Id.  If a reasonable jury could find the defendants guilty beyond a reasonable doubt of all elements of the charged offense, we must affirm the conviction.  Id.

On count one, the prosecution had to prove, through direct or circumstantial evidence, beyond a reasonable doubt that "each defendant knowingly and voluntarily agreed with others" to distribute drugs.  United States v. Rivera Calderón, 578 F.3d 78, 88 (1st Cir. 2009).  Evidence of a knowing agreement could include evidence that the defendants took actions that furthered the conspiracy's goals.  United States v. García-Pastrana, 584 F.3d 351, 377 (1st Cir. 2009).

1.    <u>Marcos Rivera-Perez</u>

Marcos Rivera-Perez admits on appeal, as he conceded while testifying at trial, that he sold drugs in El Cerro, but he says the evidence did not show he sold drugs for the Chevres-Motta conspiracy.

Sufficient evidence connected Rivera-Perez to the Chevres-Motta conspiracy. Both a lead investigator in the case and a confidential informant identified him and testified that he sold drugs in El Cerro. Videos showed him selling drugs from black fanny packs, as the conspiracy's other sellers did. Rivera-Perez was shown selling drugs from the stairwell near the basketball court, a regular drug point for this conspiracy. Videos showed Rivera-Perez selling to, interacting with, and standing nearby known conspiracy members and clients.

A jury could easily reject the idea that Chevres-Motta and his coconspirators would permit a competing drug dealer to sell in the heart of their small, isolated neighborhood at one of their usual drug points. A reasonable juror instead could conclude that Rivera-Perez sold drugs for this conspiracy and therefore agreed and intended to further its aims.

2.    <u>Juan Carlos Torres-Rodriguez</u>

Torres-Rodriguez, the crack cooker, who lived twenty minutes from El Cerro, also argues that the evidence showed at most

he cooked crack with his neighbor, Motta-Morales, but not for the rest of the El Cerro conspiracy led by Chevres-Motta.

The evidence was sufficient. In several phone calls, played at trial, Torres-Rodriguez and Motta-Morales discussed cooking crack together. The evidence supported the jury's conclusion that they were collaborating to cook crack for Chevres-Motta's El Cerro organization for two reasons.

First, the jury heard many phone calls in which Motta-Morales discussed his work as a cooker with a number of conspiracy members over a period of months. In particular, Motta-Morales discussed his work with the conspiracy leader, Chevres-Motta, who was Motta-Morales's cousin. He reported his progress cooking crack, discussed how to buy more cocaine to cook, and planned how to deliver drugs to Chevres-Motta and receive payment.

Second, many calls played before the jury between Torres-Rodriguez and Motta-Morales supported the inference that they were working for Chevres-Motta, since they referenced Chevres-Motta several times by his street name. Motta-Morales reported to Torres-Rodriguez Chevres-Motta's instructions and comments about their work cooking crack, and he did so once shortly after he had ended a call with Chevres-Motta.

### 3. Emanuel Rivera Maldonado

Rivera Maldonado, the former Naranjito municipal police officer, urges that the evidence did not show that he intended to

help a drug conspiracy or even that he knew he had spoken with a conspiracy member; he says he was simply helping family. He did, from his position as a police officer, provide help to the conspiracy, and a reasonable jury could conclude that he knew what he was doing and intended to assist the drug conspiracy. Phone calls captured on the wiretap between Rivera Maldonado and Rolando Motta-Morales, who cooked for the El Cerro group, linked Rivera Maldonado to the larger conspiracy. Rivera Maldonado was Motta-Morales's cousin and brother-in-law. A jury could have reasonably concluded that, in those calls, Rivera Maldonado gave Motta-Morales confidential police information to help Motta-Morales avoid police detection.

On March 2, 2008, Motta-Morales called Rivera Maldonado. Motta-Morales reported that a white Ford Mustang had been following him and provided the car's license plate. Two officers investigating the conspiracy had been using that car that day for surveillance.

In response to this report, Rivera Maldonado went through police channels and learned that the license plate was unregistered. In Puerto Rico, unregistered license plates typically denote law enforcement vehicles. Although he knew this information was confidential and its release could jeopardize a police investigation, Rivera Maldonado called Motta-Morales and reported that the license plate was unregistered. Rivera Maldonado

warned Motta-Morales to be careful and acknowledged that the plate could belong to a police vehicle.

The officers in the vehicle, realizing from the wiretap their cover was blown, then tested for the source of the leak. They drove the white Mustang to the police station on March 3. Rivera Maldonado came out and inspected the car in the parking lot. The officers approached Rivera Maldonado, told him they were using the car to locate a fugitive in Palmarito, and asked Rivera Maldonado for help. Rivera Maldonado told them his cousin, who lived in that area, had reported that car was watching him. He called Motta-Morales, while standing with the investigators, and told Motta-Morales that the car belonged to police.

About three hours later, Rivera Maldonado again called Motta-Morales and encouraged him to help find the fugitive, stating that police would leave the area once the fugitive was captured. Motta-Morales agreed that he would prefer less police presence near his home, observing that the police were placing too much "heat" on his "place." On March 9, 2008, Rivera Maldonado called Motta-Morales again to report having seen strange cars on property Motta-Morales's family owned.

The jury could reasonably reject Rivera Maldonado's story that he gave his cousin the license plate information because another drug dealer, "El Gordo," had threatened Motta-Morales's life. Rivera Maldonado testified that he believed the car could

belong to El Gordo and did not know his cousin was involved in the El Cerro drug conspiracy. Rivera Maldonado admitted, however, that he was aware that Motta-Morales knew Chevres-Motta and that Chevres-Motta ran a drug ring in El Cerro. And although he claimed he believed Motta-Morales's life was in danger, he never made a report of Motta-Morales's phone call or took steps to protect him from a death threat.

A jury also could have inferred that Rivera Maldonado intended to further the conspiracy's aims by helping Motta-Morales avoid police detection. Rivera Maldonado knew that he gave Motta-Morales confidential information that could risk other officers' investigation and even lives. Rivera Maldonaldo also counseled his cousin to be careful and to help locate the fugitive, which would remove police scrutiny from Motta-Morales's area.

B.          "Overview" Testimony by Agent Chavez

Evidentiary objections, including to overview testimony, are reviewed for abuse of discretion when they were preserved and for plain error when they were not.[2]  See United States v. Hall, 434 F.3d 42, 56-57 (1st Cir. 2006); United States v. Casas, 356 F.3d 104, 113 (1st Cir. 2004).  Even if there was an error, however, we affirm if it was harmless.  See Hall, 434 F.3d at 57.

---

[2]    The defendants did not always clearly object to the foundation for Agent Chavez's testimony.  Although they may not have preserved every concern they raise on appeal, we treat their objections under the abuse-of-discretion standard.

Rivera-Perez, the seller, and Torres-Rodriguez, the crack cooker, object to the lay witness testimony of Special Agent Regino Chavez, who was a lead investigator on this case. While Agent Chavez was testifying, the government played for the jury video tapes of conspiracy members participating in drug activity and wiretap recordings of phone conversations between conspirators.[3] On appeal, the defendants argue that eighteen portions of this testimony were improper "overview" testimony.

We break those portions into two categories. First, the defendants object to Chavez's testimony that placed the videos and recordings in the context of this conspiracy. He identified members of the conspiracy and their roles and related what they were doing and saying to the broader conspiracy. Second, they contest Chavez's testimony translating for the jury how actions taken on the video and statements made in the recordings related to drug activity. Chavez identified drug activity and interpreted coded language.

We have previously cautioned that prosecutors should not permit investigators to give overview testimony, in which a government witness testifies about the results of a criminal investigation, usually including aspects of the investigation the

_____

[3] The government played digital copies of video recordings made on tape, after Agent Chavez testified that he had seen the original recordings and the digital copies were identical. Torres-Rodriguez's argument that the digital copies violated the best evidence rule is meritless. See Fed. R. Evid. 1003.

witness did not participate in, before the government has presented supporting evidence.  Overview testimony at times involves a witness's assertion of facts not based on his own knowledge when those facts are not otherwise proven.  E.g., United States v. Rodriguez, 525 F.3d 85, 95-96 (1st Cir. 2008); Casas, 356 F.3d at 118-20.

The prohibition on overly broad overview testimony arises from the basic principle in the Federal Rules of Evidence that witnesses, other than experts giving expert opinions, should testify from personal knowledge.  See Fed. R. Evid. 602, 701, 802; see also, e.g., Casas, 356 F.3d at 118-20 (criticizing overview testimony because it was not based on the witness's personal knowledge); United States v. Mazza, 792 F.2d 1210, 1214-16 (1st Cir. 1986) (holding that an officer's testimony was inadmissible hearsay when he gave an overview of an investigation based in part on what other officers told him).  A foundation should be laid establishing the basis of a witness's knowledge, opinion, or expertise.  See Fed. R. Evid. 602, 701, 702; see also, e.g., United States v. García-Morales, 382 F.3d 12, 17 (1st Cir. 2004) (criticizing overview testimony "that [the defendant] was a member of the drug conspiracy, even though the prosecution had not yet introduced evidence supporting this conclusion"); 6 J.B Weinstein & M.A. Berger, Weinstein's Federal Evidence § 1006.04[3], at 1006-14 (J.M. McLaughlin ed., 2d ed. 2006) ("It is improper . . . for a

party to open its case with an overview witness who summarizes evidence that has not yet been presented to the jury.").

The district court did not abuse its discretion in admitting Chavez's testimony about how the videos and wiretap recordings fit into the rest of the conspiracy as based on Chavez's personal knowledge. The prosecution laid a foundation that Chavez had personal knowledge of the conspiracy and its membership. He was a lead investigator; went to El Cerro at least fifty times; and repeatedly participated in video and personal surveillance, wiretap surveillance, and controlled drug buys. He testified that his knowledge was based on his personal observations.

If a proper foundation is laid, government witnesses may testify about matters within their personal knowledge and give lay or, if qualified, exert opinion testimony. Relevant here, we have long held that government witnesses with experience in drug investigations may explain the drug trade and translate coded language for juries, either through lay or, if qualified, expert testimony. See United States v. Santiago, 560 F.3d 62, 66 & n.1 (1st Cir. 2009). This testimony is not overview testimony and is properly admitted. See Casas, 356 F.3d at 119.

Chavez's testimony translating the videos and wiretap recordings helped the jury understand evidence it was hearing and seeing. E.g., Santiago, 560 F.3d at 66. The jury could independently evaluate Chavez's interpretations, and the defendants

-14-

exhaustively cross-examined Chavez about possible alternative interpretations.

### III. CLAIMS OF LUIS ROSADO-PÉREZ AS TO HIS PLEA

Rosado-Pérez argues on appeal that his plea was invalid because the district court did not ensure that he knowingly and voluntarily entered into several terms of his plea or ascertain that a factual basis existed for his plea. Fed. R. Civ. P. 11(b)(2), (3).

Rosado-Pérez concedes that he did not raise these objections in the district court, and so our review is for plain error. United States v. Torres-Oliveras, 583 F.3d 37, 40-41 (1st Cir. 2009); United States v. Serrano-Beauvaix, 400 F.3d 50, 53 (1st Cir. 2005). Rosado-Pérez must demonstrate that the district court committed clear error affecting his substantial rights that undermined the "fairness, integrity, or public reputation of judicial proceedings." Torres-Oliveras, 583 F.3d at 41. To show his substantial rights were affected, Rosado-Pérez must "show a reasonable probability that, but for the [Rule 11] error, he would not have entered the plea." United States v. Borrero-Acevedo, 533 F.3d 11, 16 (1st Cir. 2008) (quoting United States v. Dominguez Benitez, 542 U.S. 74, 76 (2004)) (alteration in original) (internal quotation marks omitted).

A.      <u>Voluntariness of Rosado-Pérez's Plea</u>

Rosado-Pérez argues that he did not understand the type and amount of drugs he was pleading to having conspired to distribute or that he was waiving his right to have the court consider further sentence reductions under 18 U.S.C. § 3553(a).[4]

Even if Rosado-Pérez could demonstrate that he would not have otherwise pled guilty, which he has not, he cannot show the court committed any error, much less plain error, by accepting his plea.[5] The prosecutor reported, in Rosado-Pérez's presence, each of the three terms Rosado-Pérez claims he misunderstood. The district court then explained them again to Rosado-Pérez and asked whether the defendant understood. Rosado-Pérez confirmed that he did.

It is true there was some discussion at sentencing about the type and quantity of drugs Rosado-Pérez had pled to conspiring to distribute. But after reviewing the plea colloquy transcript,

---

[4]      Rosado-Pérez also argues that he did not understand the prosecutor's statement that several terms of his plea agreement mirrored the terms for other defendants in the case. The prosecutor said that, like the other defendants, Rosado-Pérez was waiving his right to appeal and to other downward departures or sentence reductions under 18 U.S.C. § 3553(a).

There was no plain error or even confusion about these terms. The prosecutor proceeded to discuss these terms in greater depth, and the district court ensured that Rosado-Pérez understood them.

[5]      The prosecution does not press the waiver-of-appeal provision of his plea before this court. We therefore need not address Rosado-Pérez's claim that he did not understand his waiver of appeal.

the court, the prosecutor, and even defense counsel agreed that Rosado-Pérez unambiguously pled to conspiring to distribute 1.5 to 4.5 kilograms of crack cocaine. Not only did Rosado-Pérez agree, during the plea colloquy, that he was pleading to having conspired to distribute crack, but he later asked what effect recent amendments to crack sentencing would have on his sentence. Moreover, this drug type and amount corresponded accurately to the base offense level to which Rosado-Pérez pled.

B.        The Factual Basis for Rosado-Pérez's Plea

Before accepting a guilty plea, a district court must find that a factual basis exists for the defendant's plea. Fed. R. Crim. P. 11(b)(3). We look at the offense the defendant has pled to committing and ask whether "the plea has a rational basis in facts that the defendant concede[d] or that the government proffer[ed] as supported by credible evidence." Serrano-Beauvaix, 400 F.3d at 53 (quoting United States v. Gandia-Maysonet, 227 F.3d 1, 6 (1st Cir. 2000)) (internal quotation marks omitted).

The district court explained every element of count one, conspiracy to possess with the intent to distribute narcotics. The court explained both the elements of a conspiracy and the elements of possession of narcotics with intent to distribute. Rosado-Pérez confirmed that he was admitting he committed that offense by acknowledging that he had acted as the district court recited and as the prosecutor had suggested in his version of the offense.

-17-

Then Rosado-Pérez admitted the type and amount of narcotics underlying that offense.

Rosado-Pérez argues that the court committed plain error, first, by not ascertaining the time frame of the conspiracy. The district court ascertained the facts essential to the offense Rosado-Pérez was admitting he committed; it did not need to go into such great factual detail. Cf. United States v. Jiminez, 498 F.3d 82, 87 (1st Cir. 2007) (noting that the facts established at a plea colloquy need only "touch all the bases" and need not develop the defendant's guilt in depth).

Rosado-Pérez also argues that the kind of drug he was pleading to was not adequately established because the prosecutor offered to stipulate that Rosado-Pérez had conspired to distribute powder rather than crack cocaine.[6] In the end, Rosado-Pérez explicitly admitted to distributing crack and pled to conspiring to distribute crack, and that plea was the basis of his sentence. That admission provided a sufficient factual basis for the court to accept his plea, and there was no error.

---

[6] At his plea colloquy, Rosado-Pérez's attorney stressed that, although his client was pleading to having conspired to distribute crack, the government had agreed to a sentence at the low end of Rosado-Pérez's guidelines range. The prosecutor responded that, if the defendant was worried, the government would stipulate that Rosado-Pérez had distributed an amount of powder rather than crack cocaine that would have produced an identical guidelines range. The defense apparently did not accept this offer.

IV.

We <u>affirm</u> the judgments of conviction.