# United States Court of Appeals
## For the First Circuit

No. 15-2065

UNITED STATES OF AMERICA,

Appellee,

v.

FRANCISCO MONTEIRO,

Defendant, Appellant.


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]


Before

Lynch, Lipez, and Barron,
Circuit Judges.

Julia Pamela Heit for appellant.
David B. Goodhand, Attorney, Criminal Division, Appellate Section, U.S. Department of Justice, with whom Carmen Ortiz, United States Attorney, Christopher J. Pohl, Assistant United States Attorney, Timothy E. Moran, Assistant United States Attorney, Leslie R. Caldwell, Assistant Attorney General, Criminal Division, U.S. Department of Justice, and Sung-Hee Suh, Deputy Assistant Attorney General, Criminal Division, U.S. Department of Justice, were on brief for appellee.

September 15, 2017

**LIPEZ**, **Circuit Judge**.    In 2011 appellant Francisco Monteiro and his accomplice Joseph Guarneri planned and executed a robbery of fellow drug traffickers Stanley and Joshua Gonsalves. Guarneri subsequently became a customer of Monteiro's, purchasing fifty to one hundred grams of heroin from him on a weekly basis. In early 2013, Drug Enforcement Administration ("DEA") agents apprehended Guarneri for drug trafficking and convinced him to turn government's witness against his former co-conspirator.

After an eight-day trial, a jury found Monteiro guilty on one count relating to the 2011 robbery and three counts relating to the subsequent drug conspiracy.    Monteiro challenges his conviction and sentence on numerous grounds.    Finding none of his contentions meritorious, we affirm.

## I. Background

We provide a summary of the essential facts of this case, framed in the light most compatible with the jury's verdict, saving additional detail for the analysis that follows.    See United States v. Manor, 633 F.3d 11, 12 (1st Cir. 2011).

### A. The 2011 Robbery

Monteiro first became friendly with fellow Boston-area drug trafficker Joseph Guarneri in 2009, and Guarneri began selling him oxycodone.    Eventually, Monteiro told Guarneri that he could supply him pills at a better price.    Soon after, the buyer-seller

relationship flipped and Guarneri began purchasing batches of fifty to one hundred oxycodone pills from Monteiro to resell.

Guarneri then began travelling to Florida to purchase larger quantities of oxycodone from another supplier. He eventually introduced two other Boston-area drug traffickers, the brothers Stanley and Joshua Gonsalves, to his Florida supplier. After Stanley Gonsalves purchased a large batch of pills from Guarneri's supplier, he asked Guarneri to set up another purchase. Guarneri and Monteiro responded to this request by formulating a scheme to rob the Gonsalves brothers.

Guarneri told Stanley Gonsalves that he could secure 10,000 oxycodone pills in exchange for $225,000. On May 13, 2011 Guarneri lured the Gonsalves brothers to Monteiro's home to execute the purported drug purchase. When the Gonsalves brothers arrived, Guarneri brought Stanley into Monteiro's home, while Joshua remained in his brother's blue Mercedes SUV with another associate and approximately $225,000 in cash. Inside the home, Stanley told Monteiro that he wanted to see the pills so that he could examine and count them. Monteiro told Stanley that he would not show him the pills until Stanley showed him the $225,000. Stanley agreed, and sent Guarneri out to his car to fetch his brother Joshua and the money.

After Guarneri reentered the home with Joshua and the money, two other accomplices who had been lying-in-wait -- Tavares

Bonnett and Michael Fula -- drew their guns and trained them on the Gonsalves brothers. Initially, Stanley refused to hand over the cash to Monteiro. To overcome this resistance, Bonnett hit Stanley on the side of the head with his gun. Stanley then handed the money over to Monteiro and his accomplices. At Monteiro's instruction, Guarneri again went outside to the Gonsalves vehicle to secure any weapons the brothers might have brought with them. After Guarneri found a gun in the vehicle, Monteiro, Bonnett, Fula, and Stanley all rushed out of the house, and Guarneri handed the weapon to Monteiro.

Disarmed, the Gonsalves brothers got into their Mercedes and drove away. At that point, four other individuals who had been hiding in the house rushed out, jumped into a parked Volvo, and sped off in the same direction as the Mercedes. Eventually, the Volvo passed the Gonsalves brothers' Mercedes, and the Mercedes rammed the Volvo off the road. Meanwhile, Monteiro, Guarneri, Bonnett, and Fula traveled to the home of Monteiro's grandmother, where they divided the proceeds of the robbery. Monteiro kept most of the money. Guarneri collected $70,000, and the remaining cash was split between Bonnett and Fula.

## B. The 2013 Drug Conspiracy

By 2012, Monteiro had begun selling heroin to Guarneri in batches of either fifty or one hundred grams. Sometimes Monteiro sold him powdered heroin. At other times the heroin was

solid, either in the shape of a hockey puck or a tall, narrow cylinder.

In early 2013, the DEA approached Guarneri and informed him that he would soon be facing a federal indictment for drug trafficking. Agents told Guarneri that he could reduce his prison sentence if he cooperated in an investigation against Monteiro, and Guarneri agreed to assist them.

Guarneri first called Monteiro while serving as a DEA informant on February 14, arranging to purchase 100 grams of heroin at a price of $6,500. The following day, Guarneri drove to New Bedford, Massachusetts and picked up Monteiro and Monteiro's cousin, Manuel Lopes, to initiate the heroin sale. Monteiro and Lopes directed Guarneri to a building, and Lopes took Guarneri into an apartment there. Inside, Guarneri gave Lopes and another individual $6,500 in exchange for 96.4 grams of heroin.

On February 20, Guarneri again met with Monteiro, this time to set up a fifty-gram heroin purchase. The two spoke again by phone two days later, and Monteiro directed Guarneri to purchase the drugs from Lopes in New Bedford. When Guarneri met Lopes later that day, however, Lopes told Guarneri that his source was not able to procure the heroin, and Guarneri left empty-handed.

Guarneri again spoke with Monteiro by phone several days later on February 25, and Monteiro confirmed that the sale would go forward that day. He also told Guarneri that they would not be

conducting the sale in the same apartment as the previous transaction because Monteiro had robbed the occupant in the interim. When Guarneri traveled to New Bedford to purchase the drugs, he found Lopes rather than Monteiro at the site. Lopes tried to coax Guarneri to advance him the money without providing the heroin, but Guarneri refused. Lopes left the site, and Monteiro showed up and berated Guarneri for not trusting his accomplice. Monteiro convinced Guarneri to hand over the money, and he purportedly left to get the heroin. However, Monteiro never came back. Later, Monteiro called Guarneri and falsely told him that he had been stopped by the police and they had seized the purchase money.

Days later, law-enforcement authorities secured arrest warrants for Monteiro and Lopes, and search warrants for their respective residences. Police executed the warrants on March 1. At Monteiro's home, police found $1,300 in currency with serial numbers matching the money that DEA agents had given to Guarneri. They also discovered seven small envelopes of heroin stamped with the word "Future" in green ink. At Lopes's residence, police found thousands of identically packaged envelopes with the green "Future" identifier.

In September 2014, a federal grand jury in Massachusetts issued a five-count superseding indictment charging Monteiro, Lopes, and another individual with conspiring to possess with

intent to distribute one hundred grams or more of heroin, in violation of 21 U.S.C. § 846 (Count 1); possession with intent to distribute and distribution of heroin, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 2); and possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 3). The indictment also charged Monteiro, alone, with conspiring to commit a Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Count 4); and using and carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) and 18 U.S.C. § 2 (Count 5).

After an eight-day trial in April 2015, a jury convicted Monteiro on Counts 1 - 4 and acquitted him on Count 5. The district court sentenced Monteiro to 250 months of imprisonment and 8 years of supervised release. Monteiro timely appealed both his conviction and sentence.

## II. Discussion

Monteiro presses six primary claims of error on appeal, asserting that: (1) the drug charges (Counts 1 - 3) and the robbery charges (Counts 4 and 5) were improperly joined and should have been severed; (2) the evidence presented at trial was insufficient to convict him for possession with intent to distribute heroin (Count 3); (3) the district court admitted evidence that he views as inappropriately prejudicial; (4) the district court erred in curtailing his attorney's attempt to question defense witness

- 7 -

Joshua Gonsalves on redirect; (5) the district court's jury instructions relating to the terms "aiding and abetting" were flawed; and (6) the district court improperly applied certain sentencing enhancements when calculating his Guidelines Sentencing Range. We address each argument in turn.

## A. Joinder of Charges and Denial of Monteiro's Motion to Sever

Before trial Monteiro argued that the drug conspiracy charges and robbery charges should have been tried separately and that the decision to join them violated Federal Rule of Criminal Procedure 8(a).[1] He also unsuccessfully argued that even if initial joinder was appropriate, the district should have severed the charges pursuant to Rule 14(a).[2] Monteiro renews both arguments on appeal.

A "Rule 8 claim is primarily one of law, which we review de novo, while [a] Rule 14 claim involves application of a general standard to particular facts, such that deference to the lower court is appropriate." United States v. Boulanger, 444 F.3d 76, 87 (1st Cir. 2006) (alteration in original) (quoting United States

---

[1] Rule 8(a) states that "[t]he indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."

[2] Rule 14(a) states: "[i]f the joinder of offenses . . . in an indictment . . . appears to prejudice a defendant . . . the court may order separate trials of counts, sever the defendant['s] trials, or provide any other relief that justice requires."

v. Meléndez, 301 F.3d 27, 35 (1st Cir. 2002)).  Hence, we review a trial court's denial of a Rule 14 motion to sever for abuse of discretion.  See United States v. Alosa, 14 F.3d 693, 694-95 (1st Cir. 1994).

**1. Joinder**

Rule 8(a) states that joinder of charges is appropriate if the offenses "are of the same or similar character" or if they "are connected with or constitute parts of a common scheme or plan."  Boulanger, 444 F.3d at 87.  We have stated that the rule's joinder provision should be "generously construed in favor of joinder."  United States v. Randazzo, 80 F.3d 623, 627 (1st Cir. 1996); see also Meléndez, 301 F.3d at 35.  The two sets of charges need not be identical, and "we assess similarity in terms of how the government saw its case at the time of the indictment."  Boulanger, 444 F.3 at 87 (quoting Meléndez, 301 F.3d at 35).  Traditionally, we consider factors such as whether the charged offenses fall under the same statute, whether the crimes involved similar victims, locations, or modes of operation, as well as when the purported conduct occurred.  Id.  Moreover, joinder is proper if it "allows the jury to see the complete set of facts about the alleged criminal enterprise."  1A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 143 (4th ed. 2016).  Hence, we also consider "the extent of common evidence" among the charged offenses.  Randazzo, 80 F.3d at 628.

Based on these considerations, joinder of Monteiro's charges was appropriate. Throughout the trial, the government sought to prove that Monteiro was not only a drug dealer, but also a "robbery artist" -- stealing both cash and drugs from other dealers -- to finance his own enterprise. Moreover, Guarneri was a key link between the two sets of crimes. He was not, as Monteiro suggests, a happenstance prosecution witness who could have testified at two different trials. Rather, Guarneri provided crucial testimony that tied together the strands of Monteiro's entire criminal enterprise, as he was both Monteiro's accomplice in robbing the Gonsalves brothers (Counts 4 and 5) and Monteiro's customer in the drug conspiracy (Counts 1 - 3). Furthermore, the government presented evidence at trial indicating that Monteiro had set up a drug deal with Guarneri, only to later steal Guarneri's money, just as he did with the Gonsalves brothers.[3] Although the sets of charges arose from events that occurred almost

---

[3] At trial, the government referred to this incident as a "robbery." Monteiro objects to this characterization, pointing out that "robbery" is a crime of violence and that he took Guarneri's money without force. The government argues that Monteiro used intimidating tactics to pressure Guarneri into handing over the money, which would qualify as a robbery. Ultimately, however, the formal characterization of the incident with Guarneri -- whether it was a robbery or theft -- does not matter for the joinder analysis. What matters is that the robbery charged in the indictment and the incident with Guarneri show a similar mode of operation -- Monteiro stealing money to fund his drug enterprise.

two years apart, that timing alone is not enough to overcome Rule 8(a)'s generous presumption in favor of joinder.

## 2. Motion to Sever

Rule 14(a) provides that a court "may order separate trials of counts" if consolidating the charges "appears to prejudice a defendant."  See also Boulanger, 444 F.3d at 87. Monteiro argues that he suffered the prejudice envisioned by Rule 14(a) because he desired to testify in his own defense on the robbery charges, but wished to invoke his Fifth Amendment right to remain silent on the drug conspiracy charges.  Indeed, we have recognized this dilemma as a form of prejudice that sometimes makes severance proper.  See United States v. Scivola, 766 F.2d 37, 42 (1st Cir. 1985).

To deserve a severance of charges in such circumstances, a defendant must make "a convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other."  Alosa, 14 F.3d at 695 (quoting Scivola, 766 F.2d at 43) (internal quotation marks omitted).  To meet this standard, a defendant must "present enough information -- regarding the nature of the testimony he wishes to give on one count and his reasons for not wishing to testify on the other -- to satisfy the court that the claim of prejudice is genuine" as well as "to enable it intelligently to weigh the considerations of economy and expedition in judicial

- 11 -

administration against the defendant's interest in having a free choice with respect to testifying."  United States v. Tracy, 989 F.2d 1279, 1283 (1st Cir. 1993) (quoting Baker v. United States, 401 F.2d 958, 977 (D.C. Cir. 1968)) (internal quotation marks omitted).

Monteiro concedes that his pre-trial motion to sever did not provide any information beyond a desire to testify as to the robbery counts and not the drug conspiracy counts.  The district court thus denied his motion for failing to demonstrate "real and substantial prejudice."  When Monteiro attempted to renew the motion to sever mid-trial, the court rejected the request as untimely.

Before us, Monteiro does not dispute the district court's specific rulings.  Rather, he now argues for the first time that our entire body of precedent requiring a defendant to provide a proffer of potential testimony violates his Fifth Amendment right against self-incrimination.  Because the argument was not raised below, this challenge is procedurally flawed in a multitude of ways.  In any event, this panel does not have the authority to overturn this court's well-established precedent. See United States v. Mouscardy, 722 F.3d 68, 77 (1st Cir. 2013) (explaining that "[t]he law of the circuit doctrine" binds future "panel decision[s] absent any intervening authority").  Moreover, we fail to see how requiring a proffer impedes Monteiro's Fifth

Amendment right. "To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled." Hiibel v. Sixth Judicial Dist. Court of Nev., 542 U.S. 177, 189 (2004). A proffer in connection with a motion to sever filed by a defendant's attorney could hardly be considered testimonial. Nor could it be used by the prosecution to later incriminate a defendant. Cf. Simmons v. United States, 390 U.S. 377, 390 (1968) (holding that defendant's testimony to establish standing for purposes of claiming a Fourth Amendment violation "should not be admissible against him at trial on the question of guilt or innocence"). Hence, Monteiro's severance argument lacks merit.

## B. Sufficiency of the Evidence on Count 3

Monteiro argues that the evidence presented by the government at trial was insufficient to convict him on Count 3, which charged possession with intent to distribute heroin. We review sufficiency challenges de novo. United States v. Alejandro-Montañez, 778 F.3d 352, 357 (1st Cir. 2015). We draw all reasonable inferences in favor of conviction, and we must affirm the guilty verdict so long as any "reasonable jury could find the defendant[] guilty beyond a reasonable doubt of all elements of the charged offense." Id. (quoting United States v. Rosado-Pérez, 605 F.3d 48, 52 (1st Cir. 2010)). Testimony from one witness, alone, can be enough to sustain a finding of guilt. Id.

At trial the government sought to prove that Lopes was the principal who committed the possession-with-intent-to-distribute crime and that Monteiro was guilty as an aider and abettor. To establish aiding and abetting liability, the government must prove beyond a reasonable doubt that the defendant "associated himself with the venture," "participated in [the venture] as something that he wished to bring about," and that he "sought by his actions to make the venture succeed." United States v. Negrón-Sostre, 790 F.3d 295, 311 (1st Cir. 2015) (quoting United States v. Lugo Guerrero, 524 F.3d 5, 13 (1st Cir. 2008)).

Although Monteiro does not contest that the government proved that Lopes committed the crime as a principal, he claims on three grounds that the government failed to establish his aiding and abetting liability.

First, Monteiro states that the government offered no evidence connecting him to Lopes on March 1, 2013, the date set forth in Count 3 of the indictment. Pointing out that authorities apprehended him at home at 6:00 a.m. on the morning of March 1, he argues that he could not possibly have aided and abetted Lopes on that date if he was sleeping from midnight through 6:00 a.m. and under arrest from 6:00 a.m. onward. The indictment, however, alleged that the crime occurred "on or about" March 1, and the government therefore needed to prove only that Monteiro aided and abetted Lopes's crime "within a reasonable time of the date stated

in the indictment." United States v. Campbell, 732 F.2d 1017, 1020 (1st Cir. 1984); see also id. ("Where the time of an offense is not important, it may be alleged generally, and 'on or about' permits a reasonable variance in dates.").

Second, Monteiro suggests an inconsistency between the jury finding him guilty of Count 3, yet failing to find that "100 grams or more of a mixture and substance containing a detectable amount of heroin was attributable and reasonably foreseeable by . . . Monteiro."[4] The jury's findings present no inconsistency. The jury could have decided that Monteiro aided and abetted Lopes's heroin possession with intent to distribute, but that he did not know the amount of drugs in Lopes's cache. In any event, inconsistent findings are "not grounds for reversing a conviction." United States v. Vizcarrondo-Casanova, 763 F.3d 89, 104 (1st Cir. 2014).

Finally, Monteiro insists that to convict him on Count 3, the jury was necessarily forced to draw too many unreasonable inferences from the presented evidence. We disagree. As discussed above, the government offered ample evidence of Monteiro working

---

[4] On the verdict sheet, Count 3 had a sub-part which the jury was required to answer if it voted to convict on that count, which read: "We further find beyond a reasonable doubt that 100 grams or more of a mixture and substance containing a detectable amount of heroin was attributable to and reasonably foreseeable by defendant, Francisco Monteiro." The jury answered this sub-part "Not Proven."

in tandem with Lopes to sell Guarneri 96.4 grams of heroin on February 14.  Other evidence demonstrated that Monteiro attempted to coordinate a second heroin purchase between Guarneri and Lopes in the following two weeks.  Also, when he was arrested, the police discovered seven envelopes of heroin in Monteiro's home stamped with the word "Future" in green ink, which were identical to thousands of envelopes discovered at Lopes's residence.  These facts, in combination, were sufficient for a reasonable jury to find beyond a reasonable doubt that Monteiro aided and abetted Lopes's possession with intent to distribute heroin.[5]

## C. Admission of Purportedly Prejudicial Evidence

Monteiro argues that the district court admitted two bodies of evidence at trial that were unfairly prejudicial: (1) Guarneri's testimony that Monteiro stole his DEA-supplied money; and (2) tape recordings that he views as overly inflammatory.  We address each in turn.

---

[5] In his brief, Monteiro attempts to rationalize the evidence presented against him by formulating an alternative explanation for the events that occurred.  This is an acceptable strategy before a jury, but on appeal this strategy flips the sufficiency issue on its head.  Our job as an appellate court is not to second-guess the jury's verdict by considering alternative accounts of the facts.  Rather, we must uphold a verdict so long as any reasonable jury could have settled upon it.  Alejandro-Montañez, 778 F.3d at 357.

## 1. Theft of Guarneri's Money

As noted above, Guarneri testified at trial that Monteiro took the $3,250 from him provided by the DEA, and never provided Guarneri the drugs that he was attempting to purchase. During summation, the prosecutor referred to this occurrence as a robbery. The prosecutor also repeatedly referred to Monteiro as a "robber" throughout the closing argument.[6]

Monteiro argues that evidence of stealing Guarneri's money was inadmissible under Federal Rule of Evidence 404(b).[7] He further contends that even if it could be properly admitted, it should have been excluded as unfairly prejudicial under Rule 403.[8] We review a district court's evidentiary rulings under Rules 404(b)

---

[6] For example: "Francisco Monteiro is a drug dealer who robs other drug dealers;" "if you're going to be a drug dealer who robs other drug dealers, you need to have a sixth sense . . . ;" and "[Monteiro] explains why Lopes has drugs in his possession at his house available for Guarneri to pick up because they robbed the guys they went to buy from a couple of days ago."

[7] Rule 404(b)(1) states that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, Rule 404(b)(2) provides for an exception, stating that such "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

[8] Rule 403 states: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

and 403 for abuse of discretion. United States v. Villarman-Oviedo, 325 F.3d 1, 11-12 (1st Cir. 2003).

We detect no abuse of discretion in the court's admission of the evidence. Rule 404(b)'s prohibition of evidence of "prior bad acts" applies "to evidence that is extrinsic to the crime charged, and is introduced for the purpose of showing villainous propensity." United States v. Roszkowski, 700 F.3d 50, 56 (1st Cir. 2012). But when the evidence presented is "intrinsic to the crime charged in the indictment . . . Rule 404(b) is really not implicated at all." Villarman-Oviedo, 325 F.3d at 11. When Monteiro took Guarneri's money, tape-recorded evidence revealed that Monteiro berated Guarneri for not handing the money over to Lopes when the two had met earlier. Furthermore, Guarneri testified that Monteiro persuaded him to hand over the DEA-supplied money by promising to "go and get the drugs and bring them back." The tape recording and Guarneri's testimony constituted direct evidence intrinsic to the crime charged in the indictment -- Monteiro's drug conspiracy with Lopes. Hence, Rule 404(b) does not prohibit its admission.

Nor was the court obliged to exclude the evidence under Rule 403. Determinations under Rule 403 require a "balancing act" that "is a quintessentially fact-sensitive enterprise, and the trial judge is in the best position to make such factbound assessments." United States v. Mare, 668 F.3d 35, 39 (1st Cir.

- 18 -

2012) (quoting Udemba v. Nicoli, 237 F.3d 8, 15-16 (1st Cir. 2001)).  We therefore only "rarely and in extraordinarily compelling circumstances . . . reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair [prejudice]."  Id.  Here, the district court's decision to admit the evidence was reasonable under Rule 403's generous standard.  The evidence was significant in demonstrating a pattern of conduct by Monteiro, and the court could reasonably conclude that any resulting prejudice was not "unfair."[9]

## 2. February 20 Tape Recordings

At trial, the prosecution presented audio-recorded evidence of a February 20, 2013 meeting between Monteiro and Guarneri in which Monteiro was purportedly attempting to arrange for Guarneri to purchase fifty grams of heroin from Lopes.  In the meeting, Guarneri complained to Monteiro about the past drug purchase, when Guarneri had been instructed to meet with Lopes and a third accomplice.  Specifically, Guarneri protested that he did not trust this other accomplice.  Monteiro responded that Guarneri need not worry about this additional person, stating: "Let me tell you something.  The motherfucker tries to do me dirty in New

---

[9] As to Monteiro's complaints regarding the prosecutor referring to him as a "robber" during his closing argument, we find no impropriety.  Count 4 charged Monteiro with committing a robbery, and the prosecutor was free to state as much during his closing argument.

- 19 -

Bedford, he's already thinking repercussion is murder, my nigga." At a later point in the recorded conversation, Monteiro complained to Guarneri about a mutual female contact calling him seeking drugs. Monteiro lamented that the woman would not stop pestering him and told Guarneri that he finally said to her: "Don't call me. . . . Bitch, I'll punch you in the fucking face, yo. You was just in a raid."

These tape recordings provided pertinent direct evidence of Monteiro's charged drug dealing. Specifically, the recordings linked Monteiro to Guarneri's heroin purchase from Lopes.[10] Even if the language used could be seen as inflammatory, we cannot say it "substantially outweighed" the probative value of the recordings. Hence, Rule 403 does not foreclose their admission.

**D. Redirect of Joshua Gonsalves**

Joshua Gonsalves -- one of the victims of the May 13, 2011 robbery for which Monteiro was convicted on Count 4 -- testified as a defense witness at trial. Although the government had presented evidence that Monteiro's accomplices damaged the Gonsalves brothers' Mercedes on the evening of the May 13 robbery,

---

[10] We note that Monteiro argued in the sufficiency section of his brief that the government proved, at best, that Monteiro and Lopes had dealt drugs in the past and that the two happened to be acquaintances, but that Monteiro was "not connected by any hard evidence" to Lopes's drug possession and that he was subjected to an "unconstitutional standard" of "guilt by association." The February 20 recordings belie this assertion.

Joshua testified that the car had actually been damaged when he was driving it on May 10. He further testified that he spent the evening of May 13 with his daughter. Monteiro's attorney did not ask Joshua any questions directly related to the May 13 robbery.

On cross-examination, the prosecutor asked Joshua a series of questions regarding his brother, Stanley Gonsalves, and Stanley's actions on the evening of May 13. The following exchange occurred toward the end of this line of questioning:

> PROSECUTOR: And did [Stanley] tell you about that bag of cash and how on May 13 he brought it to [a woman's] house?
>
> JOSHUA: No, he did not.
>
> PROSECUTOR: And how [Stanley] was concerned after the robbery that someone would come after the rest of the cash and that's why he brought it to [her] house, right?
>
> JOSHUA: No, he did not. He never mentioned the robbery, a robbery to me, any robbery. He never mentioned the bag of cash. I'm sure if he was trying to hide a bag of cash, he wouldn't have let too many people know if he was hiding it or where he was hiding it.

On redirect, Monteiro's attorney asked Joshua: "You were asked about a robbery on May 13, 2011, weren't you?" The prosecutor immediately objected to this question, though Joshua responded: "Yes." Before the court ruled on the objection, Joshua offered, unsolicited: "I was never robbed." The prosecutor asked the court to strike the response, and the court instructed the jury: "Jurors, anything that was said when a question was not

- 21 -

pending is not for you to consider."  The court then sustained the prosecutor's objection, noting that it recalled the question in reference to be about "the bag of money" and not about "the robbery."  Precluded from questioning Joshua about the May 13 robbery, Monteiro's attorney ended his redirect.

Monteiro argues that his attorney was unfairly cut off from fully questioning Joshua, a "key defense witness, whose testimony could well have made a drastic difference" in the jury's finding on whether the charged robbery occurred.  "The scope of redirect examination is discretionary with the trial court and should be reversed only upon a showing of abuse of discretion." United States v. Catano, 65 F.3d 219, 226 (1st Cir. 1995). Additionally, we have specifically noted that limiting redirect to the "scope of cross" is a permissible exercise of a trial court's discretion.  United States v. Millan, 230 F.3d 431, 438 n.4 (1st Cir. 2000).

Here, the district court stated that to the best of its memory, Gonsalves was not asked about the May 13 robbery on cross-examination.  As the transcript indicates, the court's recollection was incorrect, and hence the premise of its ruling was faulty.  But any error that occurred was harmless.  Monteiro's attorney desired to pursue his line of questioning to reinforce that Joshua was not a victim of the May 13 robbery.  Joshua had already testified that his car was damaged on May 10 and that he

- 22 -

had spent May 13 with his daughter.  Even without the redirect examination, Joshua clearly represented to the jury that he had not been a victim of the May 13 robbery.  Moreover, the evidence of Monteiro's guilt was overwhelming.

**E. Jury Instructions on Aiding and Abetting**

Both the prosecution and defense submitted proposed jury instructions before Monteiro's trial commenced.  Because the government sought to prove Monteiro's guilt on Counts 2 and 3 by way of an aiding and abetting theory of liability, both sides included proposed language on the definition of "aiding and abetting."  The government's proposed language adopted this circuit's pattern jury instruction on aiding and abetting that was in place at that time:

> To "aid and abet" means intentionally to help someone else commit the charged crime.  To establish aiding and abetting, the government must prove beyond a reasonable doubt:
>
> First, that someone [el]se committed the crime of possession of heroin with intent to distribute; and
>
> Second, that the defendant consciously shared the other person's knowledge of the possession of heroin with intent to distribute, intended to help that person, and took part in the endeavor, seeking to make it succeed.
>
> Defendant need not possess the heroin himself, be present when the possession is performed, or be aware of the details of its execution to be guilty of aiding and abetting.  But a general suspicion that an unlawful act may occur or that something criminal is happening

is not enough.  Mere presence at the scene of the possession with intent to distribute and knowledge that the possession with intent to distribute is being committed are also not sufficient to establish aiding and abetting. But you may consider these among other factors.[11]

Monteiro's attorney submitted the following alternative:

In order to prove that the defendant aided and abetted th[e] possession with intent [to distribute heroin] by Lopes[,] you must find beyond a reasonable doubt that [Monteiro] associated himself with that possession in some way on or about March 1, and that he affirmatively participated in the venture in some fashion as to make it succeed.

The district court adopted the government's proposed instruction. At the charge conference, Monteiro objected to the omission of some of his proposed jury instructions, but he did not object to the aiding and abetting instruction.  Nor did he object after the jury was instructed.

After jurors began deliberating, they sent a note to the court which asked: "Why is aiding and abetting not on the verdict form when it is mentioned on page thirty-five as to charges Two and Three?"  The court answered this question, without objection, by stating: "[A]iding and abetting, as you were

_____

[11] The model jury instruction on aiding and abetting was updated in June 2016.  However, the updated instruction made no substantive changes to the instruction that was in place at the time of Monteiro's trial. Compare 1st Cir. Model Jury Instruction 4.18.02(a) (2014) with 1st Cir. Model Jury Instruction 4.18.02(a) (2016).

- 24 -

instructed on page thirty-five, is an alternative theory of culpability as to both Counts 2 and 3.  It applies to Counts 2 and 3 and your verdict form."

After further deliberation, the jury sent back another question: "Is merely aiding and abetting sufficient to convict on a charge, specifically Counts 2 and 3?  Also, please clarify 'an alternative theory of culpability' in layman's terms."  At this point, Monteiro's attorney asked the court to submit his proposed definition of "aiding and abetting" as an additional instruction to the jury.  The court denied this request and noted Monteiro's objection.  The court then answered the jury's question in the following manner:

> The response to your question is "yes."  If the government has proven aiding and abetting beyond a reasonable doubt, then you must convict the defendant on that count.  Aiding and abetting is explained on page thirty-five of the jury instructions and applies to Counts Two and Three.
>
> What I meant by "alternative theory of culpability" is that aiding and abetting can be a basis for finding the defendant, Mr. Monteiro, guilty of Count 2 or 3 as an alternative to a theory of culpability as a principal on those counts as explained on pages thirty-two to thirty-three of the jury instructions.

Aside from Monteiro's objection to the denial of his additional jury instruction, neither party objected to the court's answer to the jury's second set of questions.

In his brief, Monteiro does not clearly state whether his appeal challenges the district court's refusal to give his instruction initially or its rejection of that instruction as a response to the jurors' second set of questions -- or both. We generally review preserved challenges to jury instructions de novo, but when a defendant fails to preserve an objection to a jury instruction at trial, our review is under the much stricter plain error standard. United States v. Delgado-Marrero, 744 F.3d 167, 184 (1st Cir. 2014). However, we review a properly preserved objection to a court's answer to jury questions mid-deliberation for abuse of discretion. United States v. Roberson, 459 F.3d 39, 46 (1st Cir. 2006). Here, Monteiro preserved an objection only to the court's failure to use his proposed aiding and abetting instruction to answer the jury's questions.

Under any standard of review, the district court's actions were proper. It was entirely appropriate for the district court to adopt the pattern jury instruction on aiding and abetting.[12] Nor was there a problem in how it answered the jury's mid-deliberation questions. Even though the government may prove guilt through an aiding and abetting theory -- and it sought to do so on Counts 2 and 3 in this case -- the questions for each count

---

[12] As we have often noted, in this circuit "although pattern instructions are often helpful, their use is precatory, not mandatory." United States v. Alverio-Meléndez, 640 F.3d 412, 423 n.5 (1st Cir. 2011).

on the verdict form asked the jury only whether it found Monteiro guilty of the underlying crimes charged in the indictment. The jury's first note understandably asked the court why "aiding and abetting" did not appear on the verdict form, to which the court properly responded that it is an "alternative theory of culpability." When the jury asked the court to clarify "alternative theory of culpability," the court accurately defined the phrase and correctly told the jury that proof of "aiding and abetting" is indeed sufficient to convict a defendant for the underlying criminal charge in the indictment. It "is a matter within the sound discretion of the trial court" whether to provide supplementary instructions in response to a jury's note after deliberations have begun. Roberson, 459 F.3d at 46 (quoting Elliott v. S.D. Warren Co., 134 F.3d 1, 7 (1st Cir. 1998)). Here the court answered the jury's questions accurately and appropriately.[13]

---

[13] Monteiro also implies -- for the first time on appeal -- that the jury instructions lacked the appropriate mens rea element as required by our recent decision in United States v. Ford, 821 F.3d 63 (1st Cir. 2016). We disagree. In that case we vacated a conviction because the jury instructions did not make clear that a defendant had to have knowledge of her counterpart's prior conviction in order to convict her for aiding and abetting a felon's possession of a firearm. Id. at 76. Here, the jury instruction clearly required that Monteiro "consciously share[] the other person's knowledge of the possession of heroin with intent to distribute." Likewise, we view Monteiro's contention that the jury instructions required a reference to his conduct on the precise date of March 1 as the same erroneous construction of

**F. Sentencing Factors**

At sentencing, the court grouped Monteiro's narcotics convictions (Counts 1 - 3) and concluded that he was at a minimum responsible for 1,096.5 grams of heroin.[14] Because the court found Monteiro was responsible for more than one kilogram (but less than three kilograms) of heroin, it assigned him a base offense level of 30. See U.S.S.G. § 2D1.1(c)(5). The district court then added two levels each for enhancements based on Monteiro's threatened use of violence in committing his crimes, see U.S.S.G. § 2D1.1(b)(2), Monteiro's pattern of criminal conduct, see U.S.S.G. § 2D1.1(b)(15)(E), and Monteiro's role as an organizer in the commission of the crimes, see U.S.S.G. § 3B1.1.(c). This approach resulted in a final offense level of 36, combined with a Criminal History Category of IV, producing a Guidelines Sentencing Range ("GSR") of 262 to 327 months of imprisonment.[15] Ultimately,

---

law we dismissed regarding his sufficiency of evidence claims above.

[14] It arrived at this calculation by adding (1) Monteiro's 96.4-gram sale of heroin to Guarneri; (2) the 0.1 grams of heroin found on Monteiro the day he was arrested; and (3) Guarneri's testimony that he purchased 50-100 grams of heroin from Monteiro every other week for the year leading up to the DEA's intervention. (Using the lower estimate provided by Guarneri, the Probation Office multiplied 50 grams by 20 weeks for a total of 1,000 grams for the third portion of Monteiro's drug quantity calculation. It chose twenty weeks as a multiplier rather than twenty-six to avoid counting drugs Monteiro sold to Guarneri when Guarneri was working as a confidential DEA informant.)

[15] The court also calculated Monteiro's offense level for the robbery count, but found that the robbery conviction did not

the court varied downward and imposed a sentence of 250 months of imprisonment.

Monteiro challenges the district court's drug quantity determination -- and the resultant GSR that flowed from it -- as well as the two-level enhancement that the court applied for Monteiro's role as an organizer. We address each contention in turn.

### 1. Drug Quantity Calculation

In Alleyne v. United States, 133 S. Ct. 2151, 2155 (2013), the Supreme Court held that "any fact that increases the mandatory minimum [sentence imposed upon a criminal defendant] is an 'element' that must be submitted to the jury" and is required to be proven "beyond a reasonable doubt." The jury found one hundred grams of heroin attributable to Monteiro's role in the drug conspiracy.[16] The mandatory sentence for a typical conviction involving this amount of heroin is "not . . . less than 5 years

---

increase Monteiro's total offense level. See U.S.S.G. § 3D1.4. Monteiro challenges a two-level serious bodily injury enhancement applied to the calculation of the robbery count's offense level. However, because the Guidelines calculation for the robbery count did not affect Monteiro's sentence, we do not consider this challenge any further. See United States v. Hinkley, 803 F.3d 85, 93-94 (1st Cir. 2015) (stating that any error in application of individual guideline was harmless because the final Guidelines calculation would not change).

[16] Although the jury made this finding on the drug conspiracy charge, Count 1, as noted above, the jury found that one hundred grams of heroin was not attributable to Monteiro on the possession with intent to distribute count, Count 3. See supra note 4.

and not more than 40 years."  See 21 U.S.C. § 841(b)(1)(B)(i). However, if the government establishes that such a defendant has been convicted of a prior felony drug offense -- which it did in Monteiro's case by filing an information with the court pursuant to 21 U.S.C. § 851(a)(1) -- the mandatory minimum sentence increases to a term of imprisonment of "not . . . less than 10 years."  Id.  No Alleyne error occurred in calculating Monteiro's statutory minimum sentence because the drug quantity that triggered the ten-year minimum was proven to the jury beyond a reasonable doubt.

Monteiro argues, however, that Alleyne's mandate applies not only to the statutory minimum terms of imprisonment, but also to the calculation of a defendant's base offense level under the Guidelines.  He asserts that the district court committed an Alleyne error when it calculated his GSR and determined by a preponderance of the evidence that more than one kilogram of heroin was attributable to him.  However, the Guidelines are merely discretionary, see United States v. Booker, 543 U.S. 220, 259 (2005), and Alleyne explicitly noted that its holding did "not mean that any fact that influences judicial discretion must be found by a jury," 133 S. Ct. at 2163.  The Supreme Court has "long recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment."  Id.  That is why we have routinely rejected this exact Alleyne argument that

- 30 -

Monteiro makes.  See, e.g., United States v. González, 857 F.3d 46, 60-61 (1st Cir. 2017); United States v. Cox, 851 F.3d 113, 120 (1st Cir. 2017); United States v. Ramírez-Negrón, 751 F.3d 42, 48 (1st Cir. 2014).  We do so again here.

**2. Enhancement for Leadership or Organizing Role.**

Pursuant to U.S.S.G. § 3B1.1(c), the district court imposed a two-level enhancement because it found Monteiro "was an organizer, leader, or manager" in a criminal activity involving fewer than five participants.[17]  Monteiro argues that the guideline should be voided for unconstitutional vagueness.  However, since Monteiro filed his brief, the Supreme Court has held that because the Guidelines are discretionary, they "are not subject to a vagueness challenge under the Due Process Clause."  Beckles v. United States, 137 S. Ct. 886, 892 (2017).

Aside from his constitutional challenge, Monteiro asserts that he should not be considered an organizer or leader under the guideline.  We have stated that "[a] defendant acts as a leader if he or she exercises some degree of dominance or power in a criminal hierarchy and has the authority to ensure that others will follow orders" and that "[a] defendant qualifies as an organizer if he or she 'coordinates others so as to facilitate the

---

[17] Monteiro erroneously argues in his brief that the court imposed a four-level enhancement for acting as an organizer or leader in a criminal scheme involving five or more people.  See U.S.S.G. § 3B1.1(a).

commission of criminal activity.'" <u>United States</u> v. <u>Appolon</u>, 695 F.3d 44, 70 (1st Cir. 2012) (quoting <u>United States</u> v. <u>Tejada-Beltran</u>, 50 F.3d 105, 111 (1st Cir. 1995)).  Here, the government presented ample evidence of Monteiro dispatching orders to both Lopes and Guarneri, as well as his coordination of the drug sales between them.  Thus, the district court did not err when it applied the role-in-the-offense enhancement.

**<u>Affirmed</u>.**